902 P.2d 1066 (1995)
120 N.M. 463
In the Matter of the TERMINATION OF the PARENTAL RIGHTS OF EVENTYR J., Gilbert C., Keith (last name unknown), Douglas B., and John Doe, Respondents, with respect to Melissa C., Christopher C., Michael P., and Anastasia B., Children.
STATE of New Mexico, Petitioner-Appellee,
v.
EVENTYR J., Respondent-Appellant.
No. 15574.
Court of Appeals of New Mexico.
July 7, 1995.
Certiorari Denied August 24, 1995.
*1068 Ernest O. Pacheco, Children, Youth and Families Department, Santa Fe, for petitioner-appellee.
Hilary Lamberton, Lamberton & Riedel, Santa Fe, for respondent-appellant.

OPINION
BLACK, Judge.
Respondent appeals from the district court's decision to terminate her parental rights to her four children. She raises three issues on appeal. First, Respondent argues that the district court's findings of abuse and neglect were not supported by clear and convincing evidence. Second, Respondent argues that the admission, in the district court proceeding, of statements she made to the Citizen's Review Board deprived her of due process. Third, Respondent argues that she was further deprived of due process by the district court's reliance on a nolo contendere *1069 plea that she entered in a previous abuse and neglect case where she was not accorded procedural due process. Based on our review of the record, we conclude that there was clear and convincing evidence to support the district court's order terminating Respondent's parental rights and that Respondent's due process rights were not violated. We affirm.

I. STANDARD OF REVIEW

The standard of proof in cases involving the termination of parental rights is whether the grounds relied upon by the district court in terminating a respondent's parental rights have been proven by clear and convincing evidence. Reuben & Elizabeth O. v. Department of Human Servs., 104 N.M. 644, 647-48, 725 P.2d 844, 847-48 (Ct.App.), cert. denied, 104 N.M. 84, 717 P.2d 60 (1986); see NMSA 1978, § 32A-4-29(J) (Repl.Pamp.1993) (establishing clear and convincing evidence standard). Our Supreme Court has described the clear and convincing evidence test as follows: "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." In re Sedillo, 84 N.M. 10, 12, 498 P.2d 1353, 1355 (1972).
On appeal, this Court may not reweigh the evidence. In re R.W., 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct.App.), certs. denied, 108 N.M. 273, 771 P.2d 981 (1989). Instead, we must view the evidence in the light most favorable to support the district court's findings. Reuben & Elizabeth O., 104 N.M. at 647-48, 725 P.2d at 847-48. The district court was in a better position to assess the live testimony than we are. It is for this reason that our scope of review is a narrow one. R.W., 108 N.M. at 335, 772 P.2d at 369. Our standard of review is therefore whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing evidence standard was met. See id. at 334-36, 772 P.2d at 368-70; In re Estate of Fletcher, 94 N.M. 572, 575, 613 P.2d 714, 717 (Ct.App.), cert. denied, 94 N.M. 674, 615 P.2d 991 (1980).

II. FACTS

On December 30, 1992, the New Mexico Children, Youth and Families Department (CYFD) filed an application seeking the termination of Respondent's parental rights to her four children: Melissa, Christopher, Michael, and Anastasia. The CYFD filed the application after several years of involvement with Respondent and her children.
On December 18, 1987, Respondent was found intoxicated and passed out in front of her house in La Bajada, a rural community south of Santa Fe. The Sandoval County Sheriff's Department took Respondent's three children (Anastasia was not yet born) into custody, and the children remained in emergency custody over the weekend. The CYFD did not file a custody petition at that time but did begin monitoring Respondent's home situation.
After receiving additional referrals regarding Respondent's neglect of the children, the CYFD took custody of the children on March 18, 1988. Respondent reportedly learned of the children being in custody on March 24, 1988, but did not contact the CYFD until March 28, 1988. In the interim, the CYFD filed an abuse and neglect petition against Respondent. The children were then placed in foster care. After Respondent's eventual compliance with the approved treatment plan, the children were returned to Respondent, one at a time, in late 1989 and early 1990. The legal custody proceeding was dismissed in July 1990, but protective supervision of the children continued until March 6, 1991.
In October 1991, the CYFD received new complaints about Respondent and her children. It was reported that Melissa was "fending for herself" and had spent the night in a car outside her grandmother's house in Santa Fe, and that Michael, not yet five years old, was found walking alone on the street outside the grandmother's house. The CYFD filed a second abuse and neglect petition against Respondent on October 11, 1991, and placed Melissa and Christopher in custody.
*1070 After the two older children were placed in the custody of the CYFD, Respondent was held in contempt of court and jailed for failing to reveal the whereabouts of the two younger children. Respondent remained in jail for approximately three months and finally disclosed the location of the two younger children only after the CYFD agreed to physically place them with her.
Under the treatment plan in the 1991 case, Respondent was evaluated and eventually entered individual therapy. Respondent and the children also attended family therapy sessions. At a periodic review hearing held on July 15, 1992, the two younger children were removed from Respondent and placed in foster care.
An application seeking the termination of Respondent's parental rights to her four children was filed on December 30, 1992. The CYFD discontinued visitation between Respondent and the children on July 15, 1993, following an argumentative family therapy session after which Respondent told the children to "go and get [them]selves adopted and there won't be any more visits."

III. BASED ON THIS RECORD THE DISTRICT COURT HAD CLEAR AND CONVINCING EVIDENCE TO TERMINATE RESPONDENT'S PARENTAL RIGHTS

The grounds for the termination of parental rights are currently codified at NMSA 1978, Section 32A-4-28 (Repl.Pamp.1993).[1] Subsection A of the statute directs the court in termination proceedings to "give primary consideration to the physical, mental and emotional welfare and needs of the child." Section 32A-4-28(A). Subsection B sets forth the specific grounds for termination:
B. The court shall terminate parental rights with respect to a child when:
....
(2) the child has been a neglected or abused child as defined in the Abuse and Neglect Act [this article] and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions which render the parent unable to properly care for the child; provided, the court may find in some cases that efforts by the department or another agency would be unnecessary, when there is a clear showing that the efforts would be futile....
Section 32A-4-28(B)(2).
Before terminating Respondent's parental rights, the district court was therefore required to make three separate findings: (1) that the children were abused or neglected, (2) that the conditions and causes of the abuse and neglect were unlikely to change in the foreseeable future, and (3) that the CYFD made reasonable efforts to assist Respondent in adjusting the conditions which rendered her unable to properly care for the children. See id. The district court found that these three elements had been proven by clear and convincing evidence, as required under Section 32A-4-29(J), and terminated Respondent's parental rights. Respondent now challenges several of the district court's findings, as well as its decision to terminate her parental rights.
We note at the outset that this Court's decision in In re Adoption of J.J.B., 117 N.M. 31, 868 P.2d 1256 (Ct.App.1993), cited by Respondent in her brief, has since been partially reversed by our Supreme Court. See In re Adoption of J.J.B., 119 N.M. 638, 894 P.2d 994 (1995). To the extent Respondent argues that her parental rights should not be terminated without a specific finding of unfitness, the Supreme Court's decision in J.J.B. is dispositive. The Supreme Court held that "parental unfitness is inherent in a finding by the [district] court that any of these conditions [i.e., abuse or neglect] exist, and no separate showing or *1071 finding by the court with reference to unfitness is necessary." Id. at 647, 894 P.2d at 1003. A separate finding of parental unfitness was therefore not necessary in the present case.

A. The Record Supports the District Court's Holding that Respondent's Children Were Abused and Neglected

An abused child is one "who has suffered physical abuse, emotional abuse or psychological abuse inflicted by the child's parent[.]" NMSA 1978, § 32A-4-2(B)(1) (Repl.Pamp.1993). A neglected child is one "who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent ... or the neglect or refusal of the parent, ... when able to do so, to provide them[.]" NMSA 1978, § 32A-4-2(C)(2) (Repl.Pamp.1993). The district court found, by clear and convincing evidence, that Respondent's children were abused and neglected under these definitions. More specifically, the district court found that Respondent emotionally abused and neglected her children by the combined effect of: (1) leaving them unattended for long periods of time, (2) exposing them to dangerous situations, (3) failing to understand their physical and emotional needs, (4) failing to empathize with their feelings, (5) being self-centered in her interactions with them, (6) exposing them to domestic violence, (7) exposing them to substance abuse, (8) showing an indifference to their needs in favor of her own, and (9) placing them with inappropriate caretakers.
Respondent challenges several of the district court's findings in support of its conclusion, arguing that her parental rights were terminated based primarily on her lifestyle choice, rather than any substantiated evidence of abuse or neglect. There is sufficient evidence in the record to support the district court's findings by clear and convincing evidence.
After the children were returned to Respondent in late 1989 and early 1990, all four children lived with her in La Bajada where Respondent home-schooled the oldest children in a "very rudimentary" manner. In January 1991, Melissa attended school in Santa Fe and lived with her grandmother during the week. Respondent and the other children were also living in Santa Fe "off and on" for about two months that Spring. Respondent admitted that Christopher "got lost ... in the shuffle" during that time period. Respondent further stated that she did "not [do] nearly as much as [she] should have" in home-schooling Christopher over those two months. Regarding Michael, the January 1991 treatment plan ordered Respondent to make arrangements for his educational needs, i.e., kindergarten. Respondent testified, however, that she did nothing at that time, but planned to enroll Michael in kindergarten after the Summer.
By October 1991, both Melissa and Christopher were attending school in Santa Fe and spending the week with their elderly grandmother, who was ill and apparently unable to properly care for them. During the time that the two oldest children were staying in Santa Fe, parents of their classmates were asked to help transport the children to and from school. Melissa and Christopher also sometimes stayed with members of the faculty. On one occasion, Melissa received permission from either Respondent or her grandmother to spend the night at a friend's house but actually stayed with this friend for two weeks, during which time Respondent did not even telephone to check on Melissa. Melissa had stayed with that same family, the O'Connors, for at least one week on another occasion, and both Melissa and Christopher stayed with them for several days at other times. In the Fall of 1991, Christopher suffered an asthma attack and had no inhaler. At the time of the attack, Christopher's grandmother was in the hospital and his mother could not be reached. Mrs. O'Connor therefore acquired an inhaler for Christopher, again took him to her home, and cared for him. Respondent testified that she did not know how long the children stayed at any one place.
Respondent also left her children in the care of others in the Summer of 1991, when she took all four children to her mother's house in Santa Fe because she "needed a break." When Respondent did not return *1072 for the children after four or five days, a friend picked up the children and took them to her home in Carson, New Mexico. The children remained in Carson for approximately four weeks, during which time Respondent testified that she was in contact with them at least twice a week. While the children were in Carson, Christopher suffered another asthma attack and was taken to the emergency room where he was given medicine. Respondent went to Carson "a couple of days" later to bring Christopher's medicine and some food stamps, and to sign a medical permission form, but did not stay with the children or bring them home. Respondent explained that she sometimes wanted time off from the children to avoid "parent burn-out."
These incidents show that Respondent continued to place her needs above those of her children and would simply pass the children on to another caretaker whenever she "needed a break." At times, Respondent was apparently even unaware of where her children were. Furthermore, the inability to get in contact with Respondent on one occasion when Christopher suffered an asthma attack and her tardy response in bringing Christopher his medicine on another occasion were evidence of neglect that was properly considered by the district court.
Other evidence supports the finding that the children were left unattended for long periods of time: (1) Melissa spent the night in a car outside of her grandmother's house, (2) Michael was seen walking alone down a busy street, (3) Respondent was heard to say she would leave the children alone, and (4) there was testimony that Respondent would sometimes lock the children outside overnight. We reject Respondent's argument that she was not responsible for two of these incidents, which occurred while the children were in the care of her ill mother. Respondent does not refute that she left the children with her ill mother for long periods of time and even testified that she knew it was difficult for her mother to take care of children. Respondent also does not deny that she sometimes "freaked out" due to certain actions of her mother. We therefore disagree with Respondent's argument that she is being "unfairly penalize[d] ... for not being able to foresee the problems her mother ended up having."
The district court also properly found that the children were exposed to dangerous situations based on the forementioned evidence, as well as the following: (1) Anastasia, age two, was observed playing on the floor near a paring knife and near a pot of boiling water, without any adult in sight; (2) Michael, age five, was observed playing by himself with a blunt knife; (3) Michael broke his arm and Respondent did not take him for medical attention for two days; and (4) Respondent refused to take Michael and Anastasia to the hospital after a car accident. Respondent has her own view about these incidents, but we do not reweigh evidence on appeal. See In re R.W., 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct.App.), certs. denied, 108 N.M. 273, 771 P.2d 981 (1989).
Respondent's own testimony supports the district court's finding that she had exposed the children to domestic violence. For example, Respondent admitted that, after a dispute with her boyfriend, she once brandished her shotgun in the presence of the children because she was afraid the boyfriend might return. She also admitted holding the boyfriend at bay with a gun on another occasion, but her testimony was unclear as to whether or not the children were present. The evidence of past domestic violence is relevant to Respondent's neglect and to her "current inability to understand and meet the needs of her children." State ex rel. Human Servs. Dep't v. Dennis S., 108 N.M. 486, 487, 775 P.2d 252, 253 (Ct.App.), cert. denied, 108 N.M. 485, 775 P.2d 251 (1989).
The district court's finding that Respondent had exposed the children to drug abuse is also supported by her own testimony. Respondent testified that (1) she had passed out after drinking tequila shots, (2) people had smoked marijuana in her home, and (3) the fathers of the two younger children both used drugs. Connie B.'s testimony that she drove Respondent and the two younger children to Madrid to buy drugs also supports this finding, as does the testimony of one of Melissa's teachers that Melissa told her of *1073 parties where people were drinking and sleeping on the floor. It was the province of the district court to weigh this testimony against any conflicting testimony presented at the hearing. See R.W., 108 N.M. at 335, 772 P.2d at 369. We will not reweigh it. Id.
Testimony by social workers and therapists also provides clear and convincing support for the district court's conclusions that Respondent failed to understand her children's physical and emotional needs and consistently put her own needs ahead of those of the children. Dr. Susan Cave, whom Respondent herself selected as her therapist, characterized Respondent as having a "personality disorder with narcissistic and dependent features." Dr. Cave also found that Respondent had a problem dealing with the parent-child relationship involving her mother, who was the children's grandmother and their other primary caretaker. Respondent admitted that she was unwilling to make certain adjustments for the sake of her children. Respondent's inability to learn to provide the care necessary for her children's well-being is clear and convincing evidence of neglect. See State ex rel. Human Servs. Dep't v. Penny J., 119 N.M. 328, 333, 890 P.2d 389, 394 (Ct.App.), cert. denied, 119 N.M. 20, 888 P.2d 466 (1994).

B. The Record Supports the District Court's Finding that the Causes and Conditions of the Neglect Are Unlikely to Change in the Foreseeable Future

The district court also found that the conditions and causes of the neglect and abuse were unlikely to change in the foreseeable future. Respondent is bound by this finding because she does not challenge it on appeal. Stueber v. Pickard, 112 N.M. 489, 491, 816 P.2d 1111, 1113 (1991). Furthermore, we agree with the district court that there was clear and convincing evidence that Respondent was unlikely to develop the ability to parent her children effectively. This conclusion is based, in part, on Dr. Cave's testimony that persons with Respondent's diagnosis "are very poor candidates for treatment or behavioral change" and that helping Respondent learn how to competently parent her children would be a "lofty goal" and "not realistic."

C. The CYFD Made Reasonable Efforts to Assist Respondent in Adjusting the Conditions that Rendered Her Unable to Care for the Children Properly

Respondent argues that the CYFD failed to make reasonable efforts to assist her in correcting the causes of the abuse and neglect. We agree with the district court, however, that the CYFD made reasonable efforts to assist Respondent.
The CYFD has been involved with Respondent and her children since 1987. While the CYFD's efforts did not achieve the desired result, the CYFD offered Respondent numerous treatment programs and opportunities to receive therapy, and Respondent participated in most aspects of the proposed treatment plans. Several professionals evaluated Respondent, not only to monitor her progress, but also to provide both individual and family therapy. Court Appointed Special Advocate volunteers worked with Respondent and her children. There were periodic reviews of Respondent's case. The Citizen's Review Board also monitored the CYFD's efforts and ultimately concluded that Respondent's parental rights should be terminated.
We find it significant that the CYFD returned the children to Respondent's care in late 1989 and early 1990, but was again forced to remove the children in 1991. Nevertheless, the CYFD continued its efforts to assist Respondent in attempting to resolve the conditions that rendered her unable to care for the children properly.
We are also unpersuaded by Respondent's contention that the CYFD was slow in providing her with individual therapy. A social worker supervisor testified that the CYFD had tried to arrange for therapy earlier, but was unable to find a therapist who was willing to work with Respondent, largely because she was not receptive to therapy. Respondent testified that she was not resistant to treatment but wanted it done by someone she thought was "competent," namely Dr. Cave. Indeed, Respondent admitted that her desire to work with Dr. Cave contributed *1074 to the delay in her receiving individual therapy.
Respondent next argues that the CYFD's "foster placement of the children was the opposite of a reasonable effort." We disagree. The record is replete with examples of the CYFD's efforts regarding therapy for Respondent and the children, referrals to treatment programs, and prior attempts at reunification. Given these efforts and the testimony by all but one expert noting no significant progress on the part of Respondent, we cannot say that the foster placement constituted "the opposite of a reasonable effort." See State ex rel. Human Servs. Dep't v. Dennis S., 108 N.M. 486, 488, 775 P.2d 252, 254 (Ct.App.), cert. denied, 108 N.M. 485, 775 P.2d 251 (1989).
Finally, Respondent relies upon State ex rel. Department of Human Services v. Natural Mother, 96 N.M. 677, 634 P.2d 699 (Ct.App.1981), to support her position. That case is distinguishable, however, in that the mother in that case had made considerable efforts to provide a suitable environment for the children, including getting a job, finding a good living arrangement, and demonstrating an interest in having her children with her. Id. at 681, 634 P.2d at 703. In the present case, Respondent has made no such efforts and, in fact, testified that she does not intend to get a job, will not learn to drive, does not plan to change certain areas of concern regarding her living arrangements, and has not even thought about what she would do if all four children were returned to her, instead preferring to "cross those bridges when those bridges were built." Moreover, Dr. Cave testified that Respondent had indicated to her that, although she wanted to maintain a relationship with all four children, she really only wanted the two youngest children to be returned to her care.
When the CYFD has made reasonable efforts to assist a parent, further efforts are not required. See In re C.P., 103 N.M. 617, 622-23, 711 P.2d 894, 899-900 (Ct.App.), cert. denied, 103 N.M. 525, 710 P.2d 92 (1985). Although Respondent failed to retain custody of the children after they were returned to her in both 1987 and 1989-90, the CYFD repeatedly attempted to preserve Respondent's family. Only after years of attempting to keep the family together did the CYFD institute this action to terminate Respondent's parental rights. We therefore agree with the district court that there was sufficient evidence of reasonable efforts to support a finding by clear and convincing evidence. See In re Wayne R.N., 107 N.M. 341, 345, 757 P.2d 1333, 1337 (Ct.App.1988).

D. The Record Supports the District Court's Holding that the Children's Best Interests Would Best be Served by Terminating Respondent's Parental Rights

Most importantly, substantial evidence of a clear and convincing nature supports the district court's finding that termination would best serve the children's best interests. We note at the outset that, in discussing the best interests of the children, the district court specifically stated that it had not considered "the relative merits of the environment provided by the foster parents and by the Respondent." That portion of Respondent's appellate argument is therefore disregarded by this Court.
Respondent's children have been subjected to what is now approximately seven years of uncertainty, and the evidence is clear that their interests would best be served by adoption. See State ex rel. Human Servs. Dep't v. Penny J., 119 N.M. 328, 334, 890 P.2d 389, 395 (Ct.App.), cert. denied, 119 N.M. 20, 888 P.2d 466 (1994). "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman v. Lycoming County Children's Servs. Agency, 458 U.S. 502, 513-14, 102 S.Ct. 3231, 3238-39, 73 L.Ed.2d 928 (1982). We therefore agree with the CYFD that the children should not be kept indefinitely in a "holding pattern." See Reuben & Elizabeth O. v. Department of Human Servs., 104 N.M. 644, 650, 725 P.2d 844, 850 (Ct.App.), cert. denied (Apr. 24, 1986).
Where it is clear, after several years of effort, that the children will not thrive, and that the causes of abuse and neglect are *1075 unlikely to change in the foreseeable future, a court is justified in terminating parental rights. In re R.W., 108 N.M. 332, 337, 772 P.2d 366, 371 (Ct.App.), certs. denied, 108 N.M. 273, 771 P.2d 981 (1989). Such is the situation in the present case. Based on the present record, the district court did not err in concluding that the children's interests would best be served by terminating Respondent's parental rights.

IV. TESTIMONY BY THE CITIZEN'S REVIEW BOARD CHAIRMAN DID NOT DEPRIVE RESPONDENT OF DUE PROCESS

Respondent attended and participated in meetings of the Citizen's Review Board (Board) pursuant to NMSA 1978, Section 32A-8-6 (Repl.Pamp.1993). At the judicial termination hearing, Respondent objected to the testimony of the Board Chairman, Dr. Paul, based upon the fact that Respondent had been assured that her previous testimony before the Board would be confidential.
On appeal, Respondent argues that she relied upon "representations of confidentiality when she participated in the meetings." She claims that she "would not have made statements to the [B]oard but for the promises of confidentiality; [and she] relied upon the promises of confidentiality to her detriment." As such, Respondent argues that the State was estopped from using her statements to the Board as evidence to support the termination of her parental rights. Respondent further asserts that "[t]he admission of Dr. Paul's testimony was erroneous, constituted a deprivation of her due process rights ... and prejudiced [her]."
To the extent that Respondent attempts to raise a constitutional issue, no such issue was raised below and cannot now be raised for the first time on appeal. See City of Hobbs v. Sparks, 85 N.M. 277, 278, 511 P.2d 763, 764 (Ct.App.), cert. denied, 85 N.M. 265, 511 P.2d 751 (1973). With regard to the remainder of Respondent's argument, we do not address Respondent's estoppel theory because we find no error in the district court's consideration of Dr. Paul's testimony and therefore no prejudice to Respondent.
Board proceedings are governed by Section 32A-8-6, which provides:
A. Prior to any judicial review by the court pursuant to Section 32-4-23 [32A-4-25] NMSA 1978, the local substitute care review board shall review any dispositional order or the continuation of the order and the department's progress report on the child and submit a report to the court. The parties in the children's court proceedings shall be given prior notice of the review board meeting and be afforded the opportunity to participate fully in the meeting.
B. The report of the local substitute care review board submitted to the court pursuant to this section shall become a part of the child's permanent court record.
As required by the statute, Respondent received notice at the Board meeting that a recommendation would be presented to the court, and she still voluntarily chose to participate in the review. Respondent therefore cannot complain that the Board considered her testimony in deciding to recommend termination of her parental rights. She now argues, however, that Dr. Paul relied upon her testimony in explaining the Board's decision in district court.
In addition to the inequity in allowing Respondent to rely upon her testimony when she thinks it useful but to seal it if it later proves detrimental, Respondent misapprehends the temporal dimensions of confidentiality in certain judicial settings. Confidentiality dictates different solutions in different situations, but it virtually never requires that proceedings remain sealed for purposes of judicial review. See First Amendment Coalition v. Judicial Inquiry & Review Bd., 784 F.2d 467, 473 (3d Cir.1986) (en banc) (grand jury testimony and trial sidebars become part of appellate record). Although many types of administrative proceedings are confidential in the sense of being shielded from public scrutiny, it does not follow that the "confidential" testimony may not be considered on appeal to determine whether the administrative recommendation is reasonable. See Nicholson v. State Comm'n on Judicial Conduct, 50 N.Y.2d 597, 431 N.Y.S.2d 340, 347-48, 409 N.E.2d 818, *1076 825-26 (1980) (per curiam); Ohio Civil Rights Comm'n v. Campbell, 46 Ohio App.2d 110, 345 N.E.2d 438, 441-42 (1975).

V. RESPONDENT WAS NOT DEPRIVED OF DUE PROCESS BY THE DISTRICT COURT TAKING JUDICIAL NOTICE OF RESPONDENT'S NOLO CONTENDERE PLEA IN PRIOR ABUSE AND NEGLECT CASE

In terminating Respondent's parental rights, the district court took judicial notice of Respondent's 1991 abuse and neglect case. With regard to its finding that Respondent's children were abused and neglected, the district court also took judicial notice of Respondent's nolo contendere plea in the 1991 case, which is deemed an admission under SCRA 1986, 10-307(A)(2). Respondent now argues that, because she was allegedly denied due process in the 1991 case, the district court in the present action again deprived her of due process by relying on the 1991 case. We disagree.
To answer Respondent's contention, we rely upon State ex rel. Department of Human Services v. Ousley, 102 N.M. 656, 699 P.2d 129 (Ct.App.1985), which held that the termination statute does not require a prior adjudication of neglect.[2]Id. at 659, 699 P.2d at 132. Rather, that statute
only requires the court to find, in the instant proceeding, that a child is neglected as defined in the definitional section of the Children's Code and to find that the conditions and causes of neglect are unlikely to change in the foreseeable future, despite reasonable agency efforts to assist the parent in effectuating a change.
Id.; see § 32A-4-28(B)(2).
In this case, as in Ousley, although the district court took judicial notice of the prior abuse and neglect proceedings, "the application for termination of parental rights was based on facts indicating a continuing state of child [abuse and] neglect stemming from the time of the prior proceedings, and not on the proceedings themselves. The court's findings of fact are based on facts and not on prior adjudications." Ousley, 102 N.M. at 659, 699 P.2d at 132. Here, the district court heard testimony and made its findings based on the evidence presented rather than simply relying upon the prior adjudication and Respondent's nolo contendere plea. This fact distinguishes both Ousley and the present case from the case cited by Respondent, State ex rel. Department of Human Services v. Perlman, 96 N.M. 779, 635 P.2d 588 (Ct.App.1981), where termination was based solely upon a void prior adjudication of neglect. See Ousley, 102 N.M. at 659, 699 P.2d at 132.
Because the district court based the termination of Respondent's parental rights not on the prior adjudication, but rather upon the facts underlying that adjudication, "all that is necessary is a finding of child [abuse and] neglect and a determination that the causes of [abuse and] neglect by [R]espondent are not likely to change despite reasonable efforts by the [CYFD]." Id. at 660, 699 P.2d at 133. The district court made such findings in the instant case, and those findings were supported by clear and convincing evidence. These termination proceedings therefore did not deprive Respondent of due process.

VI. CONCLUSION

The district court's findings are supported by clear and convincing evidence, and those proceedings did not violate Respondent's due process rights. The decision of the district court is therefore affirmed.
IT IS SO ORDERED.
APODACA, C.J., and PICKARD, J., concur.
NOTES
[1] Although many of the actions that form the basis of this dispute occurred before the July 1, 1993 effective date of the new Children's Code, NMSA 1978, Sections 32A-1-1 to -20-1 (Repl.Pamp.1993), the parties refer to the new Children's Code in their briefs. Because the parties are content to rely on the new Children's Code and because the relevant provisions have not changed significantly, we also cite to the new Children's Code.
[2] Although Ousley was decided prior to the 1993 revisions to the Children's Code, this proposition remains valid under Section 32A-4-28.