2005-NMCA-066

114 P.3d 367

STATE of New Mexico ex rel. CHILDREN, YOUTH AND FAMILIES DEPARTMENT, Petitioner–Appellee,

v.

SHAWNA C., Respondent–Appellant,

and

In the Matter of Lakota C., a Child.

No. 24625.

Court of Appeals of New Mexico.

April 20, 2005.

Rebecca J. Liggett, Children's Court Attorney, N.M. CYFD, Santa Fe, for Appellee.

Nancy L. Simmons, The Law Offices of Nancy L. Simmons, P.C., Albuquerque, for Appellant.

## OPINION

FRY, J.

{1} Both Shawna C. (Mother) and Benjamin O. (Father) appeal the district court's adjudication that each parent abused and neglected their infant daughter (Child). We combined the appeals due to the shared record and related issues and in order to resolve Child's status in one opinion. We conclude that the district court properly could have determined that clear and convincing evidence showed Mother neglected Child. We conclude that there was insufficient support for a finding of abuse or neglect as to Father. Finally, we hold that the abuse and neglect statute is not so vague as to violate substan-

tive due process protections under the United States Constitution.

## BACKGROUND

{2} We requested that the parties brief the issue of whether an abuse and neglect adjudication is a final, appealable order that would provide this Court with jurisdiction to hear such an appeal. Recently, we confirmed that this Court does have jurisdiction to hear appeals of abuse and neglect adjudications because such determinations are sufficiently final to justify our review. *State ex rel. Children, Youth & Families Dep't v. Frank G.*, 2005–NMCA–026, ¶ 39, 137 N.M. 137, 108 P.3d 543, *cert. granted*, Sup.Ct. No. 29,042 [Vol. 44, No. 11 SBB 21, 2005 WL 937479 (Feb. 21, 2005) ]. While we review the initial determination of abuse and neglect, the district court retains continuing jurisdiction for the required periodic reviews of the child's custody. *Id.* ¶ 42; *see* NMSA 1978, § 32A–4–25.1 (1997) (providing that a permanency hearing shall take place within six months of the initial review with subsequent hearings to be held every three months as needed). Therefore, we have jurisdiction to consider both Mother's and Father's appeals as long as this appeal is not made moot by further actions of the district court.

{3} The Children, Youth and Families Department (CYFD) initiated the present action by filing a petition alleging abuse and neglect and an affidavit for an ex parte custody order. The following basic facts are set out in CYFD's abuse and neglect petition, CYFD's affidavit for custody, CYFD's pre-dispositional study, and testimony at the adjudication hearing held in late 2003. Mother and Father are not married, do not live together, and by Child's birth were no longer in an ongoing relationship. Child was born at a hospital in early 2003. The day after Child's birth, the hospital staff notified CYFD of concerns for Child's safety due to heated arguments between Mother and Father, Mother's odd behavior and apparent inability to care for Child, and Mother's revelation that several of her prior children had been removed from her involuntarily. A CYFD social worker responded but opted not to file an abuse and neglect petition and

released Child to Father, pending a mental health evaluation of Mother.

{4} When Child was one month old, Mother apparently contested custody before the domestic relations court. The domestic relations court gave legal custody to Child's paternal grandmother (Grandmother), concluding that Father was not a suitable caretaker based in part on the court clinician's view that he lacked empathy and parenting ability and had a criminal record. That court reportedly ordered that Grandmother take drug tests and not leave Child unattended with Father, and that both Mother and Father attend a consultation at the Court Clinic.

{5} Child then lived with Grandmother and Father from April 2003 to August 2003, during which time no reports of abuse or neglect were received by CYFD; Child attended day care and was being seen by a pediatrician during this time. After a home visit by CYFD to Grandmother's home, the social worker reported that the "house was suitable" for Child. During these four months, Mother was not living with Child and was preparing to move out of New Mexico.

{6} Grandmother tested positive in August 2003 for use of controlled substances and, although the details are not clear from the record, the matter again came before the domestic relations court. That court determined that Child should be placed in protective custody and initiated an emergency referral to CYFD. Child has been in foster care since that time, with visitation provided for both parents. Additional facts relating to Mother and Father are set out below in connection with analysis of the adjudication of each parent.

## ANALYSIS

### Sufficiency of the Evidence to Support Adjudication

{7} Both parents challenge the sufficiency of the evidence underlying the district court's adjudication that they abused or neglected Child. To meet the standard of proof in an abuse or neglect proceeding, the fact finder must be presented with clear and convincing evidence that the child was

abused or neglected. NMSA 1978 § 32A–4–20(H) (1999); *In re Melissa G.*, 2001–NMCA–071, ¶ 12, 130 N.M. 781, 32 P.3d 790. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995) (internal quotation marks and citation omitted). Our standard of review "is a narrow one" and we may not re-weigh the evidence. *Id.* "Our standard of review is therefore whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing evidence standard was met." *Id.* Although the record in this appeal contains descriptions of events taking place after the adjudication of abuse and neglect, such as permanency plan hearings, our review is limited to a determination of whether the district court could have found that the parents abused or neglected Child based upon the evidence before it. We therefore disregard any of the evidence contained in the record that arose after the adjudication of abuse and neglect.

{8} In adjudicating Child as abused or neglected at the hands of both parents, the court found that three statutory definitions of abuse or neglect were shown by clear and convincing evidence: NMSA 1978, § 32A–4–2(B)(1) (1999) (stating that "[an] 'abused child' [is one] . . . who is at risk of suffering serious harm because of the action or inaction of the child's parent" (internal quotation marks omitted)); Section 32A–4–2(E)(2) (stating that "[a] 'neglected child' [is one] who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well being because of the faults or habits of the child's parent" (internal quotation marks omitted)); and Section 32A–4–2(E)(4) (stating that "[a] neglected child [is one] whose parent . . . is unable to discharge his responsibilities to and for the child because of . . . mental disorder or incapacity"). We summarize the evidence before the district court as to each parent and then assess the findings

made by the district court in light of that evidence.

**Mother**

{9} In its petition alleging abuse and neglect and its affidavit for custody, CYFD stated that its investigation showed that "[M]other has serious mental health problems to the extent that the staff at the hospital . . . did not believe that . . . [M]other could appropriately respond to the needs of the baby," and that Mother "continues to have serious mental health issues and is unstable." The petition recounted the fights at the hospital and Mother's departure from New Mexico to Missouri. The affidavit detailed Mother's "extensive criminal history and mental health concerns" as the reason why the domestic relations court decided not to place Child with Mother. CYFD's investigative social worker reported that in his interview with Mother, she was visibly upset, discussed moving away, and disclosed that several of her older children had been taken away from her, but that she "could not give specifics" about those instances. Mother later stated that five of her older children had been removed from her involuntarily. The social worker reported that Mother refused to meet with a therapist at the hospital, as requested by the staff, that she inappropriately entered other patients' rooms, and that the hospital staff believed Child would be in danger if left with Mother. CYFD concluded that Mother's mental health history would endanger Child. Finally, the petition recounted the domestic relations hearing at which the guardian ad litem (GAL) and court clinician recommended that Child be placed with CYFD.

{10} CYFD ordered a psychological evaluation of Mother, particularly to assess any impact of her mental health on her ability to parent. The psychologist met with Mother in one session to evaluate her by means of a diagnostic interview and selected tests, but he did not observe Mother interacting with Child. The psychologist testified at the adjudication hearing that due to Mother's limitations, he was not able to administer some of the test instruments, which require a sixth-grade reading level. He testified that Moth-

• er functions at the "extremely low range of intellectual functioning" and had "serious risk factors" in terms of "overall cognitive and neurological functioning." The psychologist related Mother's IQ scores as 55 for verbal, 62 for performance, and 55 for post-scale IQ. He testified that such scores would not necessarily render a person generally, nor Mother in particular, incompetent to parent, but he would have "reservations" about such a parent's ability.

{11} In addition, the psychologist found Mother tested at a "high moderate range" of depression, although he found that parents typically have some level of depression once a child is removed from them. The psychologist diagnosed Mother as having: (1) dysthymic disorder, due to her long-term, moderate depression; (2) adjustment disorder with anxiety; (3) cognitive disorder, not otherwise specified, due to her apparent neurologic deficits; (4) mild mental retardation; and (5) personality disorder, not otherwise specified, with borderline features. The psychologist testified that the most significant factors to his diagnosis of the personality disorder were Mother's history of having five children previously taken involuntarily, her self-reported difficulty in maintaining good relationships, and her overall lifestyle of being unhappy and "reactive," instead of proactive, to situations. The psychologist concluded that Mother's testing indicated a risk of poor judgment and poor impulse control, and generally he "would be concerned [about] the safety of any child placed with her[,] particularly an infant," although he stated that he did not know whether Mother was currently unable to care for Child.

{12} Prior to the adjudication, CYFD issued a pre-dispositional study regarding Mother's visitation with Child, which took place three times per week. CYFD concluded that Mother "does not appear to have an understanding of [Child's] need[s] or how to appropriately care for her needs." This conclusion was based upon Mother's attempts to feed Child solid food before Child could eat it, overfeeding Child, excessive changing of Child's diaper, and inability to comfort Child. This report contained CYFD's assessment that Mother would not be "able to safely care for [Child]."

{13} Mother testified at the adjudication hearing and stated that she loved Child and could care for her. She testified that she had an apartment, which CYFD had visited and deemed safe, and that she had income from Social Security disability. She noted that she had not ever abused Child, had never even had custody of her, and that she very much wanted to raise Child.

{14} The district court found that: (1) Mother's conduct at the hospital indicated that she was not able to care for Child; (2) her mental health interferes with her ability to care for Child; (3) Mother has a history of prior involuntary terminations of parental rights; and (4) her "situation, mental health diagnosis and history create a significant risk of serious harm" if Child were placed in her care.

{15} We conclude that the totality of the evidence presented supports the court's findings and judgment. On appeal and at trial, Mother emphasized that she has not abused Child and has not had an opportunity to actually demonstrate her parenting skills with Child. While this is true, we note that she has had an opportunity to demonstrate her abilities with five older children. Her admission of involuntary termination of her parental rights to those older children operates as clear and convincing proof of that fact. *In re State ex rel. Children, Youth & Families Dep't v. Amy B.*, 2003-NMCA-017, ¶ 12, 133 N.M. 136, 61 P.3d 845. While this fact is not determinative for a finding of abuse and neglect, it is considered an aggravated circumstance under the Abuse and Neglect Act (the Act) in the context of termination of parental rights, as a basis to forego reunification efforts. § 32A-4-2(C)(4) (stating that "aggravated circumstances include those circumstances in which the parent, guardian or custodian has[ ] had his parental rights over a sibling of the child terminated involuntarily" (internal quotation marks omitted)). Using the prior involuntary terminations as background, we conclude that Mother has been provided a reasonable opportunity, without success, to demonstrate her ability to parent. *Amy B.*, 2003-NMCA-

017, ¶ 16, 133 N.M. 136, 61 P.3d 845 (noting the "very real relationship between the past conduct and the current abilities" to parent). Contrary to her contention, Mother need not be given the opportunity with this particular child if there is a substantial risk of harm. *In re Termination of Parental Rights of Sherry C. & John M.*, 113 N.M. 201, 208, 824 P.2d 341, 348 (Ct.App.1991) (stating that a court could use neglect of a mother's older children to determine that she could not care for a child that had been removed from her care at birth); *In re I.N.M.*, 105 N.M. 664, 668, 735 P.2d 1170, 1174 (Ct.App.1987) (explaining that "a parent does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain the protection of the state" (internal quotation marks and citation omitted)). Mother has been provided with the opportunity to interact with Child in visitation, and observations on her inability to provide basic care for Child caused CYFD to conclude that Mother was not able to "appropriately care for [Child's] needs." The testimony about Mother's erratic behavior, mental illness, and cognitive limitations further supports a conclusion that her mental incapacity greatly limits her ability to parent.

{16}  Construing the evidence in a light supporting the judgment, we conclude that the fact finder could have found the evidence clearly and convincingly demonstrated that Mother was unable to effectively parent due to her mental disorder and incapacity, which meets the definition of neglect under Section 32A–4–2(E)(4) (defining "neglected child" as a child whose "parent ... is unable to discharge [her] responsibilities to and for the child"). We affirm the judgment on this basis and need not decide whether abuse under Section 32A–4–2(B)(1) (defining "abused child" as a child "at risk of suffering serious harm") or neglect under Section 32A–4–2(E)(2) .(defining "neglected child" as a child "without proper parental care [or] control") were proven.

**Father**

■ {17}  Father also met, for one session, with a CYFD-selected psychologist, but the psychologist never observed Father in-

teracting with Child. The psychologist testified at the adjudication hearing that some tests would not be valid due to Father's incomplete responses or due to Father's lack of candor. The psychologist assessed Father as being highly dominant, which the psychologist associated with "high need for control, high need for power[,] and poor interpersonal function[,]" and mentioned a connection between such dominance and domestic violence and child abuse. He testified that Father also scored high within the mania category, which raised concerns about impulse control and paranoia. The psychologist based his concern regarding Father's impulse control on Father's prior criminal convictions as well as the argument at the hospital. He testified, "[I]f somebody has been involved in a crime and antisocial behavior, it just raises questions in my mind about the ability to raise a child .... [P]eople who commit crimes tend to be more self[-]centered and not have a great deal of empathy for others." He testified that it is not generally possible to teach a person to be empathetic. Even with the assumption of a five-year period in which Father had had no criminal convictions, the psychologist's opinion was unchanged because such criminal acts are indicative of personality disorders, which are resistant to change. The psychologist described Father as angry and oppositional, and the psychologist felt the anger was part of Father's character and not just due to losing custody of Child.

{18}  The psychologist diagnosed Father as having: (1) adjustment disorder with anxiety, which was not unusual given the situation with CYFD; (2) a principal diagnosis of schizotypal personality disorder; (3) narcissistic personality disorder "primarily because [he] didn't hear any awareness [from Father] of how this situation might be affecting [Child]"; and (4) antisocial personality disorder. The psychologist concluded that he had "very strong reservations about placing a child in [Father's] care," that if a bonding and interaction study was done "right now, [Father] would probably not do well," and that Child was at the stage where empathy from a caregiver was "vitally important" to Child's development. He based his conclusions on his view that Father lacked suffi-

cient empathy to be able to read a child's cues or facilitate attachment, and had high indicators of dominance and need for control, which "broadly correlate" with child abusers and domestic violence perpetrators. In addition, the psychologist feared how "[Father's] anger might impact the child." He also felt Father was evasive in the area of substance abuse. The psychologist recommended that Father meet with a child development specialist who could actually observe Father interacting with Child and give instruction on how to parent, and that Father receive ongoing psychiatric care.

{19} The court clinician of the district court testified as to her involvement with the case, which she described as varying from being a passive observer to providing information to the district court about the parties. The clinician testified that she did not observe Father with Child, other than perhaps once in passing. She concluded that Father, Mother, and Grandmother could not make "a whole parent" even if "you put all three of them together," although they all clearly loved Child and were not responsible for their poor upbringing and personal histories. The clinician felt that, despite the recent period in which Father went without criminal activity, Father's criminal history "raise[d] concern" for her. The court had before it a report of Father's criminal history, which includes three felony convictions in the period from 1993 to 1995, and then five misdemeanor convictions from 1995 to 1999. There were a number of arrests or dismissed cases from 1993 to 2000 that did not result in convictions, and a 2002 arrest for domestic assault initiated by Mother that was dismissed. The court asked Father about his criminal history, which he had described in testimony as "several years ago," to which the court replied, "It's not that many years ago." Finally, Father testified that he has a full-time job, was no longer living with Grandmother, had a suitable apartment, and would like to raise his daughter.

{20} The court found that: (1) in his meeting with the court clinician, Father showed a lack of awareness of Child's needs and lack of empathy that would interfere with his ability to care for Child; (2) Father's mental illnesses would put Child at risk of serious harm if placed with Father; (3) Father's criminal history, lack of candor with the court about that history, and his failure to prevent placement of Child with Grandmother (who tested positive for use of controlled substances) indicate his inability to care for Child; and (4) Father's actions and inactions placed Child at risk of serious harm.

{21} Father has had no other children and has had no prior allegations of child abuse or neglect. We find it significant that the first person to make a pronouncement on his inability to interact properly and "with empathy" with Child was the court clinician, who did not observe him more than momentarily with Child. The psychologist found Father "lacked empathy" and could not respond to Child's cues, but the psychologist did not observe Father with Child and based his assessment on a single session in which Father failed to describe the situation's impact on Child. Those who actually observed Father interacting with Child commented positively. This includes the CYFD investigative social worker and the CYFD employees who observed his visitation, who stated, "[Father] appears to be able to care for the basic needs such as feeding and changing." The suggestion that Father permitted or allowed Grandmother's drug use around Child was supported only by a positive urinalysis. There was no testimony that Grandmother actually took care of Child while under the influence, had neglected Child, or had drugs around Child. Father did, for some period, take care of Child without incident, including taking her to day care and her pediatrician. The court clinician alleged that Father failed to follow the domestic relations court's stipulations, but there is no contention that these violations constituted abuse or neglect.

{22} Even when we view the evidence in the light most favorable to the State, the evidence is insufficient to support the district court's conclusion that Father abused or neglected Child. The State's evidence consisted of the following: (1) testimony of the court clinician and the psychologist, neither of whom observed Father with Child, who found Father to be not empathetic enough;

(2) allegations that Father is angry, either at CYFD and Mother, or generally; (3) the psychologist's opinion noting that Father's personality traits are "broadly correlated" with those who may be violent, although there was no evidence of Father's being violent to Child; and (5) Father's criminal history, which rendered him presumptively at risk as a parent, in the psychologist's view. This evidence does not meet a clear and convincing standard, instantly tilting the scales in the affirmative, for any of the statutory definitions. Evidence of Father's somewhat aged criminal history, his anger, his mental health issues as diagnosed by the psychologist, and the fact that he "permitted" Grandmother to care for Child while Grandmother ingested drugs, while not reflecting exemplary behavior, does not support anything more than a vague inference of future harm. Such an inference provides an insufficient basis for finding either neglect or abuse within the meaning of the statute. We therefore reverse the district court's judgment that Father abused or neglected Child.

### Constitutionality of the Abuse and Neglect Act

{23} Mother contends that the abuse and neglect statute is so vague as to violate due process protections under the Fourteenth Amendment, particularly for the mentally disabled. In connection with this argument, Mother also contends that the district court effectively based its finding of abuse or neglect upon Mother's character and mental deficiency "standing alone," without any showing of actual errors or omissions in Mother's parenting. We dispose of this latter concern and then address the core void-for-vagueness argument.

{24} We review a challenge to the constitutionality of a statute de novo. *State v. Laguna*, 1999–NMCA–152, ¶ 24, 128 N.M. 345, 992 P.2d 896. To the extent Mother asks us to interpret the Act, that also presents a question of law that is reviewed de novo on appeal. *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995). A void-for-vagueness attack need not be preserved to enable our review. *Laguna*, 1999–

NMCA–152, ¶ 23, 128 N.M. 345, 992 P.2d 896.

{25} Mother appears to be claiming that the Act permits an improper "status" judgment, which in the criminal context would violate the Eighth Amendment's ban on cruel and unusual punishment. *See Robinson v. California*, 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (stating that criminalizing the status of being addicted to narcotics violates the Eighth Amendment); *see also Powell v. Texas*, 392 U.S. 514, 533, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (limiting *Robinson* to statuses and finding that being drunk while in public did involve an actus reus).

{26} Mother argues that she "committed no prohibited *act*; instead, her current mental state and her past conduct ... condemned her to lose custody." It is true that the psychologist suggested in his testimony that Mother's low IQ was a concern and his testimony could be construed to mean that her status alone may have been sufficient to remove Child from Mother. Similarly, Mother contends that "there is no statutory authority for taking custody of a child, based on perceived future harm, in the absence of some actus reus by a parent ... [and unless the] act or omission [is] affecting the child who is the current subject of ... proceedings." Mother is only partially correct. The State may indeed act based upon perceived future harm, and prior harm to other children may properly be considered as relevant to neglect or abuse of a different child. *In re I.N.M.* 105 N.M. at 668, 735 P.2d at 1174; § 32A–4–2(B)(1) (defining "abused child" as being "at risk of suffering serious harm").

{27} We agree with Mother that low IQ, mental disability, or mental illness alone are not sufficient grounds for a finding of abuse or neglect. *See In re Kidd*, 261 N.W.2d 833, 835 (Minn.1978) (explaining that in a termination context, mental illness alone is not "other conduct" detrimental to a child); *In re J.L.B.*, 182 Mont. 100, 594 P.2d 1127, 1136 (1979) ("[M]ental deficiencies alone do not justify termination if there is no evidence that the child is in some way harmed or likely to be harmed because of the parent's

condition."). We also agree with Mother that if the State fails to show any prior acts or omissions that constitute abuse or neglect and makes predictions of harm based solely on an unfavorable status, such as mental disability, then the State would fail to meet the statutory basis for abuse and neglect. However, we conclude that the Act does not permit a finding of neglect based solely upon the mental disability or mental illness of a parent.

{28} It is true that the Act defines a neglected child as one "who is without proper parental care and control ... *because of the faults or habits of the child's parent.*" § 32A–4–2(E)(2) (emphasis added). Despite the use of the emphasized phrase, however, neglect may not be viewed as the automatic result of a person's status. This phrase imposes a fault requirement in those cases where a parent fails or refuses to provide proper care for a child. This culpability requirement operates to exclude cases in which even an exemplary parent could not provide "proper parental care and control" due to circumstances beyond that parent's control or where a parent is acting reasonably. *See In re Melissa G.*, 2001–NMCA–071, ¶ 20, 130 N.M. 781, 32 P.3d 790 (stating that where a mother reasonably failed to notice harm to her child, but there was no evidence of mother's culpability, through either intentional or negligent disregard, the claim of neglect failed as a matter of law). One could hypothesize many situations in which a parent could not properly care for his or her child temporarily, yet the inability would not be due to the "faults or habits" of the parent, or a situation where a reasonable parent would fail to protect or aid a child due to lack of notice. In either case, there would be no culpability.

{29} By contrast, the fault requirement in Section 32A–4–2(E)(2) is absent from Section 32A–4–2(E)(4), which states that a parent's "incarceration, hospitalization or physical or mental disorder or incapacity" is a basis for neglect if that condition makes the parent "unable to discharge his responsibilities" as a parent. *See State ex rel. Children, Youth & Families Dep't v. Joe R.*, 1997–NMSC–038, ¶ 1, 123 N.M. 711, 945 P.2d 76 (stating that incarceration alone does not constitute neglect, as there must also be an inability to parent). Thus, the legislature has (1) imposed a culpability requirement in the section focusing on absence of "proper parental care and control or subsistence," Section 32A–4–2(E)(2), and (2) defined certain circumstances in Section 32A–4–2(E)(4) that, regardless of the culpability of the parent, may constitute neglect if, and only if, such a status causes the parent to be unable to discharge his or her parental responsibilities.

{30} An unfavorable personal status, such as low IQ, poverty, mental illness, incarceration, prior convictions, or addiction, is therefore relevant only to the extent that it prompts either the harms defined as abuse, or the neglect which is defined as the failure to provide "proper parental care and control" or an inability "to discharge his responsibilities to and for the child." *In re Adoption of J.J.B.*, 119 N.M. 638, 646, 894 P.2d 994, 1002 (1995) (stating that to comport with due process, parental unfitness must be shown "by proof of substantive criteria demonstrating parental inadequacy or conduct detrimental to the child"). While such statuses, particularly if extreme in nature, may well lead to neglect or abuse as defined by the Act, we emphasize that the focus should be on the acts or omissions of the parents in their caretaking function and not on apparent shortcomings of a given parent due to his or her unfavorable status. While no child would ask to have a poor, incarcerated, or addicted parent, poverty, incarceration, or addiction alone do not perforce equate to neglect as set out in the statute. *See State ex rel. Children, Youth & Families Dep't v. Joe R.* 1996–NMCA–091, ¶ 9, 122 N.M. 284, 923 P.2d 1169 (holding that father's conviction for murdering child's mother, and subsequent incarceration for life, did not establish neglect as a matter of law), *rev'd on other grounds,* 1997–NMSC–038, 123 N.M. 711, 945 P.2d 76. Thus, we conclude that the Act does not permit a court to find abuse or neglect based solely on a parent's status. Here, the State showed that Mother's status renders her unable to care for Child, and neglect was properly found under Section 32A–4–2(E)(4). The fact that this inability

may spring from a mental disability is relevant under Section 32A–4–2(E)(4) only because the State showed that Mother is "unable to discharge [her] responsibilities to and for the child." Since the statute requires a clear and convincing showing of an inability to parent in the specified circumstances, there is no basis for a court to find neglect solely based upon a parent's unfavorable status, and the district court did not do so in Mother's case.

■■■ {31} Mother also challenges the Act as being "void for vagueness" as applied to her. She claims that the phrases "without proper parental care ... because of the faults or habits of the child's parent" in Section 32A–4–2(E)(2), "unable to discharge his responsibilities ... because of ... mental disorder" in Section 32A–4–2(E)(4), and finally, "at risk of suffering serious harm" in Section 32A–4–2(B)(1), when read together, fail to give parents notice of what conduct is prohibited and vest "entirely too much discretion" in CYFD and the district court in determinations of parental unfitness. We summarize the void-for-vagueness doctrine, apply the doctrine to the Act, and conclude that it is not unconstitutionally vague.

■■■ {32} In the criminal context, due process requires that a statute be drafted so that it provides fair warning of the conduct sought to be proscribed and so it does not encourage arbitrary or discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *State v. Luckie,* 120 N.M. 274, 276, 901 P.2d 205, 207 (Ct.App.1995). A strong presumption of constitutionality underlies each statute, and the defendant has the burden to prove unconstitutionality beyond all reasonable doubt. *Laguna,* 1999–NMCA–152, ¶ 24, 128 N.M. 345, 992 P.2d 896. A claim of vagueness is analyzed according to the particular facts of each case. *Luckie,* 120 N.M. at 276, 901 P.2d at 207. A defendant will not succeed if the statute clearly applied to the defendant's conduct. *Laguna,* 1999–NMCA–152, ¶ 24, 128 N.M. 345, 992 P.2d 896.

{33} Although the void-for-vagueness doctrine typically arises in criminal cases, New Mexico courts have previously considered similar challenges to both abuse and neglect and termination of parental rights statutes. *In re Candice Y.,* 2000–NMCA–035, 128 N.M. 813, 999 P.2d 1045; *In re Doe,* 100 N.M. 92, 666 P.2d 771 (1983); *State ex rel. Health & Social Servs. Dep't v. Natural Father,* 93 N.M. 222, 598 P.2d 1182 (Ct.App. 1979). We first address the fair warning or notice aspect and then consider the arbitrary enforcement facet of the doctrine.

■■■ {34} In assessing whether a statute provides adequate notice, we ask if the statute "allows individuals of ordinary intelligence a fair opportunity to determine whether their conduct is prohibited." *Laguna,* 1999–NMCA–152, ¶ 25, 128 N.M. 345, 992 P.2d 896. "If the language makes the statute understandable and sensible, that is all that is necessary to uphold it as valid." *State v. Andrews,* 1997–NMCA–017, ¶ 11, 123 N.M. 95, 934 P.2d 289. In addition, the federal constitution does not require "impossible standards" of clarity in statutes, only that the language "convey[ ] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947); *see Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (stating that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language").

{35} In *Natural Father,* this Court addressed a vagueness challenge to the phrase "unable to discharge [his] responsibilities ... because of ... other physical or mental incapacity" in the predecessor statute to what is now Section 32A–4–2(E)(4). *Natural Father,* 93 N.M. at 225, 598 P.2d at 1185. There, we held that the words "mental incapacity" gave sufficient notice that the inability to discharge one's responsibilities as a parent because of mental incapacity constitutes neglect. *Id.* In 1987, the legislature expanded the definition, to what it is today, by adding the term "disorder" to mental incapacity and the phrase became "unable to discharge his responsibilities ... because of ... mental *disorder* or incapacity." NMSA 1978, § 32–1–3(L)(4) (1972, repealed 1978) (current ver-

sion at NMSA 1978, § 32A–4–2(E)(4) (1999) (emphasis added)). We consider that the addition of the term "disorder" did not make the statute any more vague; instead, it clarified the circumstances in which a parent's inability to function as a parent would constitute neglect without a showing of culpability.

{36} Mother's prior extensive history with abuse and neglect actions cuts substantially against her claim that she had no notice; her personal experience provided notice of what similar laws, if not those of New Mexico, proscribe. *See United States v. Corrow*, 941 F.Supp. 1553, 1562 (D.N.M.1996) (holding that, in an "as applied" challenge, a criminal defendant was on notice from his own experience with Navajo culture that certain Navajo artifacts had cultural significance and therefore he could not claim that the term "cultural patrimony" failed to give him notice of what types of items were protected). It is well settled that where a person is aware his or her conduct is approaching the line of prohibited conduct, he or she bears the risk of treading near the line. *Id.*

{37} Also persuasive to us is that our Supreme Court has found that language that is arguably substantially more vague meets constitutional requirements of specificity. *See In re Doe*, 100 N.M. at 93, 96–97, 666 P.2d at 772, 775–76 (holding that the phrase "the parent/child relationship has disintegrated" was not vague, and properly could be a basis for termination of parental rights). We conclude that Mother herself had adequate notice of what was prohibited in light of common understanding and practices regarding parental responsibilities, combined with her own experiences. She has not shown beyond a reasonable doubt that the Act failed to provide her with a fair opportunity to know that an inability to discharge her responsibilities due to mental disorder or incapacity constituted neglect. Similarly, she has not raised any serious doubt that the phrases "proper parental care" or "risk of serious harm" are not understandable and sensible when considered in light of common understanding and practices regarding parenting. A law's "[g]enerality is not the equivalent of vagueness." *Watso v. Dep't of Soc. Servs.*, 841 P.2d 299, 309 (Colo.1992)

(en banc). We agree with a case cited in *Natural Father*, which states that when a statute "deals with children in need of care that they are not receiving[,] this may arise in so many ways that it would be impossible to state them all with great exactitude." *In re Minor Children of F.B.*, 323 S.W.2d 397, 401 (Mo.Ct.App.1959).

{38} Finally, we conclude that the Act does not encourage standardless or arbitrary enforcement of the law. The United States Supreme Court has noted that "the more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine-the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855 (internal quotation marks and citation omitted). Where a law does not provide "minimal guidelines, a . . . statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* (internal quotation marks and citation omitted). Since CYFD performs the law enforcement function under the Act, we therefore ask whether the relevant portions of the Act provide it with *"carte blanche"* that would permit "arbitrary or standardless enforcement power." *Laguna*, 1999–NMCA–152, ¶ 33, 128 N.M. 345, 992 P.2d 896.

{39} In our view, the phrases "without proper parental care and control . . . because of the faults or habits of the child's parent" in Section 32A–4–2(E)(2), "unable to discharge his responsibilities . . . because of . . . mental disorder" in Section 32A–4–2(E)(4), and "at risk of suffering serious harm" in Section 32A–4–2(B)(1) provide adequate standards to guide CYFD in its enforcement activities and do not invite or encourage arbitrary enforcement. Law enforcement always "requires the exercise of some degree of police judgment." *Grayned*, 408 U.S. at 114, 92 S.Ct. 2294. We are not faced here with anything like the kind of sweeping laws that have been struck down because they provide "no standards" to guide law enforcement and permit enforcers to effectively do as they please. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 31

L.Ed.2d 110 (1972) (stating that where there are no standards governing the exercise of the discretion granted by a law, "the scheme permits and encourages an arbitrary and discriminatory enforcement"). In addition, our prior decisions do not reveal a chronic over-reaching or propensity by CYFD to use the Act as an arbitrary basis to act against parents based upon mere disapproval of their lifestyle. The Act's language is broad enough to cover the myriad harms that may confront children, but not so broad and standardless to give CYFD carte blanche to file petitions against any parent it chooses. *See In re J.L.B.*, 594 P.2d at 1135 (upholding the Montana neglect act because there was no pattern of over-broad interpretation and the language was broad enough to include important harms to children).

CONCLUSION

{40} We affirm the finding of abuse or neglect as to Mother and reverse the finding of abuse or neglect as to Father. We also conclude that the challenged portions of the Abuse and Neglect Act are not so vague as to violate constitutional protections as applied to Mother.

{41} **IT IS SO ORDERED.**

BUSTAMANTE, C.J. and CASTILLO, J., concur.