This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

      Petitioner-Appellee,

v.                                                                            **No. A-1-CA-36948**

**JENNIFER W. and KEATON B.,**

      Respondents-Appellants,

**IN THE MATTER OF KADEN B.,
and BRYSON B.,**

      Children.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Sandra A. Price, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Jane B. Yohalem
Santa Fe, NM

for Appellant Jennifer W.

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant Keaton B.

Richard J. Austin, P.C.
Richard J. Austin
Farmington, NM

Guardian Ad Litem

## MEMORANDUM OPINION

**B. ZAMORA, Judge.**

**{1}**  Jennifer W. (Mother) and Keaton B. (Father) (collectively, Parents) appeal the result of an adjudication hearing involving their children K.B. and B.B. (collectively, Children). Pursuant to the Abuse and Neglect Act (the Act), NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2019), the district court found that Children were abused as it is defined in NMSA 1978, Section 32A-4-2(B)(4) (2016, amended 2018).[1] On appeal, Parents argue that the district court erred in its application of Section 32A-4-2(B)(4) and that substantial evidence did not support a finding of abuse. Unpersuaded, we affirm.

## BACKGROUND

**{2}**  The district court's finding of abuse stems from the events of May 31, 2017, that occurred at a motel in Albuquerque, New Mexico where the family was staying while on their way back home to Farmington, New Mexico, and events that occurred the next day, June 1, 2017, at a relative's home. At the time of the events, Parents' older son, K.B., was nine years old and their younger son, B.B., was three. Because the testimony varied between Parents and the other witnesses from the New Mexico Children, Youth and Families Department (CYFD), we describe the CYFD witnesses' and Parents' testimony separately.

### CYFD's Witnesses

**{3}**  Paternal grandfather testified that he and Father talked on the phone three or four times on May 31, 2017. The first call occurred around 8:00 or 9:00 a.m., when paternal grandfather called Father because he was concerned that he had not heard from Father in a few days. In that call, Father stated that he did not know where his family was, did not know what interstate he came in on, and that he had been up all night working on a fence with a friend. In the last call between Father and paternal grandfather, Father was upset and crying because, after he had returned to the motel, he had gotten into a "big fight" with Mother. Father told paternal grandfather that Mother had gone out shopping and came back "messed up." Father left the motel because Mother tried to throw a television on his head and Father was concerned Mother was going to call the police.

---

1 All citations to Section 32A-4-2 in this opinion are referring to the 2016 version, which was in effect at the time of the incident at the motel.

**{4}** The same day, around 2:00 p.m., Mother called paternal grandfather, her speech was slurred, and she asked for Father's phone number. Paternal grandfather provided Father's phone number, but Mother called him back several times within a short period, each time asking for Father's phone number. After the third call, paternal grandfather told Mother to write the number down. Mother called back a fourth time moments later, again requesting Father's phone number.

**{5}** Paternal grandfather then called his daughter, Brittney Blair, Children's aunt, who testified that she then went to the motel. Brittney testified that she arrived at the motel around 6:30 or 7:00 p.m., finding Mother and Children in the motel lobby. Brittney observed that Mother had makeup running down her face, did not make any sense, did not know where she was, was crying and mumbling, had a tooth that was "hanging by a thread," had a fat lip, tripped and fell, and could not find the room she was staying in. Brittney informed Mother that she was there to pick up Children so Mother "could sleep off whatever was going on." Mother told Brittney that Father was trying to kill her and that she wanted to go with Brittney and Children. Brittney further observed that Children were dirty and did not have shoes on, K.B. appeared "terrified," and B.B. appeared "scared" and had food crusted around his mouth.

**{6}** Brittney further testified that she and her husband were waiting in their car for Mother to get her things and saw Mother on the balcony of her motel room. Brittney testified that Mother exposed herself. Mother then flipped off a man in the car next to Brittney who had become upset and had yelled something to her. K.B. witnessed this display from inside Brittney's vehicle. Brittney testified that the police arrived to the motel around 7:45 p.m., as did Father shortly thereafter. Subsequently, Children went home with Brittney that night.

**{7}** According to Brittney, Parents were supposed to meet her to pick up Children at Cracker Barrel at 7:30 a.m. the next morning, June 1. Brittney, and police that escorted her at her request, proceeded to Cracker Barrel as planned, but Parents failed to show up at the scheduled time, prompting Brittney and the police to return to Brittney's home. The police then called CYFD. Around 9:30 a.m., Parents arrived at Brittney's house and as Parents were exiting their vehicle, the police stopped them before they were able to enter Brittney's home.

**{8}** Brooke Keeling, a CYFD investigator who had arrived at Brittney's home in response to the police call, testified that Mother told her "they had a few drinks" the day before. Ms. Keeling further testified that Mother appeared fidgety, dirty, disheveled, was talking quickly, and her jacket had brown stains on it. Albuquerque Police Department Detective Maureen O'Brien also testified that Mother was dirty, had a busted lip, a missing tooth, a lot of makeup on, and it was hard for her to stand up straight. Detective O'Brien believed that Mother "may have been under the influence of something." According to Detective O'Brien, Father was also dirty and disheveled. When Parents were informed that Children were being taken into custody, Ms. Keeling testified that Mother responded that "she didn't want [K.B.] anyway, [she] only wanted [B.B.]."

**{9}** The district court also heard testimony from various witnesses regarding previous events involving Parents in which there was evidence of possible substance abuse. The district court considered such evidence as useful to providing "history and context," but did not consider such evidence when reaching its decision.

**Parents' Testimony**

**{10}** Mother testified that on May 31, 2017, Father left the family's motel room in the "late morning" to get breakfast for the family. Mother also testified that Father became lost because the family was staying at a different motel than the one they normally stayed at in Albuquerque. Father did not return for a couple hours and Mother became worried.

**{11}** Because Father was gone so long and the phone was broken in their room, Mother instructed K.B. to go to the front office of the motel to call his paternal grandfather, while she stayed in the room with B.B., who was asleep. K.B. remained in her sight the entire time he was gone from the room. K.B. returned to the room and said he was unable to make the phone call. Mother then went down to the front office with Children to call paternal grandfather. Mother called him and requested Father's phone number because Father had a new phone and Mother did not remember the number. Paternal grandfather did not have the number and said he was going to call Brittney.

**{12}** Mother further testified that Brittney and the police arrived later and the police threatened to take Children. Father then returned to the motel and offered to be drug tested, but the police refused. The police told Parents that Children were either going to spend the night with Brittney or they were going to call CYFD.

**{13}** At the hearing, Mother denied that she had taken or ingested "anything" on May 31. She claimed that she had only taken a sleeping pill and drank half a beer the night before. Mother denied that she was slurring her speech that she had any problems walking, that she had exposed herself in any way, or that she had a busted lip and a broken tooth on May 31. Mother testified she had split her lip and loosened her tooth when she slipped on water on the floor after taking a shower, but that occurred on June 1, not May 31.

**{14}** According to Mother, the plan was to pick up Children at 7:30 a.m. the next morning from Brittney's house, although Father testified that there was no agreement to meet at Cracker Barrel and no set time to get Children. Mother testified that they did not show up until 9:00 a.m. because the alarm on their phone did not go off. Mother testified that she might have appeared dirty because she had spilled chocolate milk on herself while she was pouring the milk into B.B.'s cup. Father testified that he did not hit Mother on May 31 or June 1, had never struck her, and a CYFD investigator testified that Father denied any allegations of substance abuse. Mother also testified that Father did not cause her injury, that they did not have a history of domestic violence, or that she had a problem with alcohol or other substances.

**The District Court's Findings**

**{15}** The district court based its decision on the events that occurred on May 31 and June 1. However, the district court stated that it was treating prior events "as useful for history and context, not as a basis for the [c]ourt's decision." The district court then concluded that Children were not in a safe situation based on Parents' condition on May 31 and June 1, and there was clear and convincing evidence that Children were abused pursuant to Section 32A-4-2(B)(4).

**DISCUSSION**

**I.      Section 32A-4-2(B)(4)**

**{16}** We first address Parents' arguments regarding their suggested interpretation of Section 32A-4-2(B)(4), which involves a question of law that we review de novo. *See In re Daniel H.*, 2003-NMCA-063, ¶ 8, 133 N.M. 630, 68 P.3d 176. Parents urge us to interpret Section 32A-4-2(B)(4) consistent with our courts interpretation of the criminal child abuse statute, NMSA 1978, § 30-6-1(D) (2009). It follows, they argue, that to make a finding under Section 32A-4-2(B)(4), a district court must determine that a parent's conduct created a "substantial and foreseeable risk of harm" to the child, a standard taken from *State v. Chavez*, a case involving allegations of criminal child abuse. 2009-NMSC-035, ¶ 22, 146 N.M. 434, 211 P.3d 891 (emphasis, internal quotation marks, and citation omitted).

**{17}** We decline to interpret Section 32A-4-2(B) in the manner argued by Parents. It is true that the language used by the Legislature in Section 32A-4-2(B)(4) and Section 30-6-1(D)(1) is similar. Despite the similarities, however, we previously have rejected Parents' approach. We do not apply the Act's definitions in the same manner as we do the definitions in criminal cases because "[a]n abuse and neglect proceeding is not a criminal prosecution." *State ex rel. Children, Youth & Families Dep't v. Michael H.*, 2018-NMCA-032, ¶ 31, 417 P.3d 1130 ("We . . . do not interpret the definition of abandonment in Section 32A-4-2(A)(2) to incorporate the elements of criminal abandonment under Section 30-6-1(B)."). Parents neither distinguish *Michael H.* nor offer any argument or authority to warrant deviating from its reasoning, and we see no basis for doing so here. As such, we do not equate the definition of an abused child under Section 32A-4-2(B)(4) with criminal child abuse under Section 30-6-1(D)(1).

**{18}** Parents also direct us to the district court's failure to make a finding of abuse or neglect under Section 32A-4-2(B)(1), (B)(2), and (F)(2), each of which appear in the abuse/neglect petition filed below, as inconsistent with the district court's finding of abuse under Section 32A-4-2(B)(4). We do not see how a failure to make a finding under these provisions would preclude a finding under Section 32A-4-2(B)(4), and Parents do not direct us to an authority indicating that this is the case. *See Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482 ("Where a party cites no authority to support an argument, we may assume no such authority exists."). The Act permits the finding of an abused or neglected child in ten defined situations as

delineated by the "or" separating each subsection within Section 32A-4-2(B) and (F). The district court did not make a finding under Section 32A-4-2(B)(1), (B)(2), or (F)(2), and thus the applicability of those provisions is not before this Court. Consequently, we confine our review to the district court's finding under Section 32A-4-2(B)(4).

**{19}** Father also argues that Section 32A-4-2(B)(4) requires that a parent affirmatively act in placing the child in a situation that may endanger the child's life or health, not just permit the situation to occur through inaction. We need not address that quandary. Inaction by Parents did not create the dangerous situation in this case. As discussed below, the danger to Children arose only because of Parents' conduct that placed Children in a dangerous situation.

## II. Substantial Evidence Supports the District Court's Finding Under Section 32A-4-2(B)(4)

**{20}** Having rejected Parent's above arguments, we next examine the evidence presented by CYFD to the district court. The district court adopted, verbatim, CYFD's and the guardian ad litem's proposed findings of fact and conclusions of law, which Parents argue reduces the deference we should give to them. The verbatim adoption of findings of fact and conclusions of law does not constitute reversible error if the district court's findings are supported by proper evidence in the record. *Rapid Temps, Inc. v. Lamon*, 2008-NMCA-122, ¶ 28, 144 N.M. 804, 192 P.3d 799. Further, Mother does not challenge any of the district court's findings of fact. *See Seipert v. Johnson*, 2003-NMCA-119, ¶ 26, 134 N.M. 394, 77 P.3d 298 ("An unchallenged finding of the trial court is binding on appeal."). Father challenges only a single finding based on a lack of substantial evidence and that finding simply states that "there was clear and convincing evidence that [Children] are abused children as defined in [Section] 32A-4-2(B)(4)[.]" As such, "our review is limited to a determination of whether the district court could have found that [Parents] abused or neglected [Children] based upon the evidence before it." *Michael H.*, 2018-NMCA-032, ¶ 21 (internal quotation marks and citation omitted).

**{21}** Consequently, we must determine whether substantial evidence supports the district court's finding of abuse under Section 32A-4-2(B)(4). *See State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 22, 132 N.M. 299, 47 P.3d 859. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

**{22}** Section 32A-4-2(B)(4) defines an "abused child" as a child "whose parent, guardian or custodian has knowingly, intentionally or negligently placed the child in a situation that may endanger the child's life or health[.]" "[I]n an abuse or neglect proceeding, the fact finder must be presented with clear and convincing evidence that the child was abused[.]" *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 7, 137 N.M. 687, 114 P.3d 367. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted).

**{23}** Here, our review of the record supports the district court's finding of abuse. Multiple witnesses testified that Mother behaved erratically on May 31 and June 1. On May 31, Mother had makeup running down her face, did not make any sense while speaking, did not know where she was, was crying and mumbling, tripped and fell, could not find her room, and was unable to remember a phone number or conversations that were only minutes apart. Paternal grandfather testified that Father told him that Parents had been in a fight. Despite the condition Mother was in, she sent K.B., who was only nine years old, down to a motel lobby on his own in an unfamiliar city. Mother later exposed herself to the public from a balcony within K.B.'s direct line of sight. Mother's disjointed condition continued into the next day, June 1, when, arriving late to pick up Children, witnesses described her as fidgety, dirty, talking quickly, disheveled, not being able to stand up straight, constantly adjusting her clothing, which was soiled or stained, and appearing to be under the influence. The evidence further established that Mother was in such poor condition she was unable to supervise or care for Children, who were described as dirty, shoeless, scared, and terrified. Any number of calamities could have befallen Children while Mother was in this state for several hours prior to Brittney's arrival.

**{24}** Father attempts to distinguish himself from Mother by arguing that he did not participate in the circumstances that placed Children in danger. We disagree and conclude that Father also contributed to the dangerous situation. Father was also acting bizarrely. Paternal grandfather testified that Father called him multiple times, Father stated that he did not know where he or his family was, and further said that he had been up all night working on a fence, despite his testimony that the family had driven into Albuquerque that same night and spent the night at the motel. Critically, after fighting with Mother, Father left Children under the supervision of Mother for several hours with full knowledge that she was "messed up." Father was, at the very least, negligent in permitting Children to remain in Mother's care unsupervised.

**{25}** Although Parents testified to the contrary, the district court was free to reject their testimony. *See State ex rel. Children, Youth & Families Dep't v. Amanda M.*, 2006-NMCA-133, ¶ 28, 140 N.M. 578, 144 P.3d 137 ("The fact finder may freely reject . . . self-serving testimony[.]"). Moreover, we agree with Parents that the Act does not permit a district court to find abuse based solely on a parent's addiction, although it does permit a finding of abuse if it prompts the harm the statute defines as abuse. *See State ex rel. Children, Youth & Families Dep't v. Amanda H.*, 2007-NMCA-029, ¶ 25, 141 N.M. 299, 154 P.3d 674 ("The unfavorable personal status of the parent is relevant only to the extent that it prompts either the harms defined as abuse, or the neglect." (omission, internal quotation marks, and citation omitted)). Such is the case here as was made clear in the district court's findings. The evidence demonstrating prior substance abuse by Parents was relevant only to the extent it provided history and context to Parents' behavior on May 31 and June 1. Thus, viewing the evidence in the light most favorable to CYFD, we conclude that substantial evidence supports the district court's finding that there was clear and convincing evidence that Children were abused pursuant to Section 32A-4-2(B)(4).

**CONCLUSION**

**{26}** For the aforementioned reasons, we affirm the district court's finding of abuse under Section 32A-4-2(B)(4).

**{27}  IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**KRISTINA BOGARDUS, Judge**