2007-NMCA-029

154 P.3d 674

STATE OF NEW MEXICO, ex rel., CHIL-
DREN, YOUTH AND FAMILIES DE-
PARTMENT, Petitioner–Appellee,

v.

AMANDA H., Respondent–Appellant,

and

In the Matter of Nathaniel H., a Child.

No. 25,623.

Court of Appeals of New Mexico.

Aug. 15, 2006.

NM Children, Youth & Families Department, Rebecca J. Liggett, Ida M. Lujan, Santa Fe, NM, for Appellee.

Lopez, Sakura & Boyd, LLP, Todd M. Lopez, Santa Fe, NM, for Appellant.

Johanna L. Studebaker, Santa Fe, NM, Guardian ad litem.

**OPINION**

ALARID, Judge.

{1} Amanda H. (Mother) appeals the district court's adjudication that she neglected her infant son (Child). We conclude that the evidence was not sufficient to support the district court's adjudication that Child was neglected by Mother and reverse. Additionally, we hold that an appeal of an abuse or neglect adjudication challenging the sufficiency of the evidence is not rendered moot by the district court's dismissal of the underlying case while the adjudication is on appeal.

**BACKGROUND**

{2} In late 2004, Mother was seen at St. Vincent's Hospital where her perinatologist recommended that labor be induced. Mother told hospital staff that she had herpes, and she wanted a caesarean delivery because she believed the disease could be transferred to Child if she delivered vaginally. Doctors examined her and determined that a caesarean delivery was not indicated. When Mother and her partner, David, were informed that Mother would have to deliver Child vaginally, they became angry and verbally abusive towards hospital staff. A hospital social worker and a security officer were called in to calm the situation.

{3} The hospital social worker testified that when she arrived, Mother was "strongly" stating that she could not deliver Child vaginally and insisting on a caesarean delivery. She also threatened to hit nurses if they touched her and spoke to staff in an insulting manner. Despite assurances from doctors that a vaginal delivery did not pose a risk to Child, Mother continued to insist on a caesarean delivery, at one point stating that she would leave the hospital if she were made to undergo a vaginal delivery. A staff member eventually persuaded Mother to remain, and she delivered Child vaginally without complications.

{4} The Children, Youth and Families Department (CYFD) became involved because several hours after Child's birth, Child's urine tested as a "weak positive" for the presence of barbiturates. A retest of the same sample of urine also tested as a "weak positive." Hospital staff notified CYFD of

the positive toxicology screen and their concerns regarding Mother's and David's behavior prior to delivery. A CYFD social worker and a Santa Fe Police Department officer responded to the hospital, where they met with the hospital social worker, Mother, and David. When they arrived, Mother and David were upset and demanded to have Child's urine retested. David's tone and manner were deemed confrontational, and after several minutes, the hospital security officer gave David a "no trespass" order requiring him to stay away from the hospital for 48 hours. Santa Fe police gave CYFD a 48-hour hold for custody of Child.

{5} Child was retested for barbiturates several hours after the original toxicology test, and Mother was also given a toxicology screen. This time, Child's urine was negative for the presence of barbiturates, and Mother tested positive only for pain medications administered during delivery. Mother was very upset and raised her voice. Mother complained about her treatment, and accused hospital staff of incompetence for referring the matter to CYFD.

{6} St. Vincent's Hospital does not allow smoking inside the hospital. CYFD presented evidence that Mother took frequent smoke breaks during which she asked nurses to care for Child at the nurses' station. On one occasion, she was gone for an hour, which the hospital social worker testified was an unusually long time for a smoke break. Additionally, once prior to delivery, Mother removed a fetal monitor used to measure stress to the fetus so that she could leave the interior of the hospital to smoke, although hospital staff cautioned her against doing so.

{7} Mother visited Dr. Kristine Parke twice for prenatal care during her third trimester of pregnancy. During these visits, Mother disclosed to Dr. Parke that she had used narcotics during her first trimester before discovering she was pregnant and smoked marijuana once during her third trimester.

{8} CYFD requested a psychological evaluation of Mother to assess the impact of any mental health issues on her ability to parent. The psychologist met with Mother for a single session lasting three and one-half hours and evaluated her by means of diagnostic tests and an interview. He did not observe Mother interacting with Child. The psychologist testified that he was unable to do a traditional parenting skills assessment on Mother because she had only had a limited time with Child. The assessment of Mother's parenting ability was made based on her general psychological health, and did not specifically measure her parenting attitudes or traits.

{9} The psychologist diagnosed Mother with (1) narcissistic personality disorder (NPD), (2) histrionic personality disorder, (3) anti-social personality disorder, (4) adjustment disorder with anxiety (due to having Child removed from her so soon after birth), and (5) opioide dependency in partial remission. The psychologist testified that Mother scored extremely high for NPD, which he characterized as "putting one's own self-interest ahead of others in one's care." The psychologist concluded that Mother had difficulty regulating extreme emotions, such as sadness or anger, when she felt them intensely. The psychologist testified that histrionic personality disorder may cause a person to act on impulse without much forethought. A person with anti-social personality disorder may feel that they are above the law when they want something. The psychologist testified that these diagnoses caused him concern about Mother's ability to develop empathy with Child and a healthy emotional attachment to Child. He stated that the risk to a child from a parent with NPD can range from "mild emotional distress to severe neglect and abuse," but he could not say where on that continuum it might fall in this case.

{10} In her conversations with the psychologist, Dr. Parke, and social workers, Mother disclosed that she had a significant history of drug abuse and a criminal history, including a one-year period of incarceration for drug distribution in 2001. Mother had been the victim of violence in her past and had engaged in violence towards others. Mother also told the hospital social worker that she was concerned about her ability to continue to pay the rent for their apartment.

{11} Dr. Parke observed Mother with Child on the two days following Child's birth and testified that Mother exhibited "great parenting" and was "perfectly appropriate, very loving, very bonded, very responsible" to Child. Dr. Parke testified that Child was healthy, well nourished, and breast-feeding well, and that Mother was taking "very appropriate care" of Child. Dr. Parke also testified that some of Mother's behavior and outbursts made her nervous. The hospital social worker testified that she only witnessed positive interactions between Mother and Child and that Mother was "very attentive" to Child and demonstrated "much love."

{12} The district court adjudicated the Child neglected, but did not make any specific factual findings on the record. Mother appealed the adjudication of neglect. While the case was pending on appeal, the district court retained jurisdiction to conduct periodic hearings to review the parties' compliance with the treatment plan and review Child's custody. *See State ex rel. Children, Youth & Families Dep't v. Frank G.*, 2005–NMCA–026, ¶ 42, 137 N.M. 137, 108 P.3d 543, *aff'd*, *In re Pamela A. G.*, 2006–NMSC–019, 139 N.M. 459, 134 P.3d 746. Before the case had been fully briefed, the district court dismissed the underlying case and returned Child to Mother's custody. Additional facts are set out in the analysis section of the opinion.

## ANALYSIS

### I. MOOTNESS

{13} As an initial matter, we must address the issue of mootness. In *Frank G.*, we determined that an adjudication of abuse or neglect is a final, appealable order. *Id.* ¶¶ 39, 41. While the adjudication of abuse or neglect is on appeal, the district court retains jurisdiction to conduct periodic hearings to monitor the parties' compliance with treatment plans and to enter additional orders. *Id.* ¶ 42; NMSA 1978, §§ 32A–4–22, –25 (2005). This case requires us to determine the effect of a dismissal of the case by the district court while the adjudication of abuse or neglect is on appeal. CYFD argues that because the underlying case has been dismissed and custody of Child returned to Mother, the appeal of the neglect adjudication is moot.

{14} Generally, appellate courts do not decide moot cases. *Gunaji v. Macias*, 2001–NMSC–028, ¶ 9, 130 N.M. 734, 31 P.3d 1008. "An appeal is moot when no actual controversy exists, and an appellate ruling will not grant the appellant any actual relief." *State v. Sergio B.*, 2002–NMCA–070, ¶ 9, 132 N.M. 375, 48 P.3d 764. Mother argues that the appeal is not moot because she faces potential adverse consequences as a result of the adjudication that she neglected Child. She notes that termination of parental rights proceedings can proceed from adjudications of neglect, and argues that her parental rights continue to be jeopardized by the adjudication that she neglected Child. We agree with Mother that the adjudication of neglect could adversely affect her in the future. *See State ex rel. Children, Youth & Families Dep't v. Michelle B.*, 2001–NMCA–071, ¶ 24, 130 N.M. 781, 32 P.3d 790 (finding that evidence of sibling abuse or neglect can be relevant to a determination of whether circumstances exist to warrant a change in custody); *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005–NMCA–066, ¶ 26, 137 N.M. 687, 114 P.3d 367 (stating that prior harm to other children may be relevant to abuse or neglect of a different child). However, we do not need to decide whether the potential adverse collateral consequences of the neglect adjudication are sufficient to create an actual controversy because we find that this case presents an exception to the mootness doctrine. An appellate court can review moot cases which present issues of substantial public interest or which are capable of repetition yet evade review. *Gunaji*, 2001–NMSC–028, ¶ 10, 130 N.M. 734, 31 P.3d 1008.

{15} This case presents a procedural situation similar to that in *Sergio B.*, 2002–NMCA–070, 132 N.M. 375, 48 P.3d 764. In *Sergio B.*, a child adjudicated delinquent appealed an order that committed him to CYFD custody for an additional year and placed the child under protective supervision for six months. *Id.* ¶ 1. On appeal, the child argued that the district court lacked jurisdiction to enter the order and that the evidence

was insufficient to justify extending his commitment to CYFD's custody. *Id.* While the appeal was pending, but before briefing was completed, the period of protective supervision expired. *Id.* ¶ 8. The State argued that the case was moot because there was no longer a case or controversy once the period of protective supervision ended. *Id.* ¶ 9.

{16} We held that the issues raised by child on appeal were capable of repetition yet evading review, thus bringing the case within an exception to the mootness doctrine. *Id.* ¶¶ 10, 11. We noted that many district court cases would involve short-term commitments of less than a year, which would expire before a full appeal could be taken and would evade appellate review if we did not invoke an exception to the mootness doctrine. *Id.* ¶ 11.

{17} The same is true of adjudications of neglect or abuse. Many of these adjudications may involve only short-term deprivations of custody and district court oversight of treatment plans. NMSA 1978, § 32A–4–25.1 (2005) (governing permanency hearings and judicial review of the child's dispositional order and contemplating dismissal of the case and return of custody to the parent as early as six months after the initial judicial review of the disposition). *See* § 32A–4–25.1(A) (mandating that a permanency hearing be commenced within six months of the initial judicial review of the dispositional order); § 32A–4–25.1(D)(3) (mandating that the district court dismiss the case and return custody of the child to the parent if sufficient evidence is not presented at the permanency hearing to rebut the presumption that returning the child to parent's custody is in child's best interest); *see also State v. Jose S.,* 2005–NMCA–094, ¶ 7, 138 N.M. 44, 116 P.3d 115 (pointing out that the short time frame for Children's Code dispositions and the lengthy time for disposition of general calendar cases meant that appeals of illegal sentences could be capable of repetition but would evade review).

{18} Because the issue of the sufficiency of the evidence is capable of repetition but may evade appellate review, we agree that we should reach the merits of Mother's appeal on this issue.

## II. SUFFICIENCY OF THE EVIDENCE

{19} The standard of proof in an abuse or neglect adjudication is clear and convincing evidence that the child was abused or neglected. NMSA 1978, § 32A–4–20(H) (2005); *Shawna C.,* 2005–NMCA–066, ¶ 7, 137 N.M. 687, 114 P.3d 367. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Termination of Parental Rights of Eventyr J.,* 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995) (internal quotation marks and citation omitted). We employ a narrow standard of review and do not re-weigh the evidence. *Shawna C.,* 2005–NMCA–066, ¶ 7, 137 N.M. 687, 114 P.3d 367. Rather, we review to determine whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing evidence standard was met. *Id.*

{20} On appeal, CYFD argues that the evidence was sufficient to support the adjudication of neglect, citing (1) the positive toxicology report, (2) the erratic and volatile behavior of Mother and David, (3) Mother's insistence that she could not deliver Child vaginally because of herpes, (4) Mother's disclosures to Dr. Parke regarding prenatal substance abuse, (5) Mother's history of violence, (6) Mother's criminal history, (7) Mother's willingness to disregard medical advice by removing the fetal monitor so she could smoke and her statements that she would leave the hospital prior to delivering Child, (8) evidence that Mother left Child in the care of nurses while she took smoke breaks, and (9) the instability in Mother's housing situation. The district court found that Child was neglected under two statutory definitions of neglect: NMSA 1978, § 32A–4–2(E)(2), (4) (1999). We analyze the evidence under the appropriate statutory provisions, and conclude that the evidence was not sufficient to support the adjudication of neglect under either statutory definition of neglect.

### A. Section 32A–4–2(E)(2)

{21} Section 32A–4–2(E)(2) defines a "neglected child" as one "who is without proper

parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, ... or [the] refusal of the parent, ... when able to do so, to provide them." To properly find that Child was neglected under this section, the district court must have been presented with clear and convincing evidence of Mother's culpability through intentional or negligent disregard of Child's well-being and proper needs. *Shawna C.,* 2005–NMCA–066, ¶ 28, 137 N.M. 687, 114 P.3d 367; *Michelle B.,* 2001–NMCA–071, ¶ 17, 130 N.M. 781, 32 P.3d 790.

{22} CYFD's evidence that Child was without proper parental care or control consisted of (1) Child's initial positive toxicology test, (2) Mother's admissions to using narcotics during her first trimester and smoking marijuana once during her third trimester, and (3) evidence that Mother left Child in the care of nurses while she left the hospital to smoke. Viewed in the light most favorable to CYFD, the toxicology evidence was inconclusive, and thus, could not meet the clear and convincing evidence standard. CYFD's witness, Dr. Parke, testified that the initial toxicology result on Child's urine was most likely a "false positive." Dr. Parke's opinion was based on the fact that Child tested negative for barbiturates only a few hours later, that Mother also tested negative for barbiturates, and that the initial positive toxicology report was only "weakly positive" for barbiturates. Dr. Parke testified that the particular type of toxicology test used in this case often results in both false positives and false negatives. Dr. Parke also testified that the initial positive toxicology result could be the result of proteins, amino acids, or bilirubins in Child's urine or the manner in which the sample was collected. Although Dr. Parke testified that she could not be sure that the result was a false positive, the burden was on CYFD to establish that Child was neglected by clear and convincing evidence. In this case, the initial positive toxicology evidence was not sufficient to instantly tilt the scales in the affirmative when weighed against the evidence in opposition, and it cannot be the basis for an adjudication that Child was neglected.

{23} Mother admitted to using narcotics during her first trimester and to smoking marijuana once during her third trimester. On appeal, CYFD contends that Child's prenatal drug exposure alone was sufficient to establish neglect. We disagree that a child who has been exposed to drugs prenatally is per se a neglected child under the Abuse and Neglect Act. While evidence of a mother's prenatal drug use can be relevant under Section 32A–4–2(E)(2), here CYFD did not establish that Child was without proper parental care because of the first trimester drug use. CYFD presented no evidence that Child's health was negatively affected by the prenatal drug exposure or that Child was born addicted to any drug. Rather, the evidence showed that Child was born healthy and without signs of drug exposure or dependency. *See State ex rel. Children, Youth & Families Dep't v. David F. Sr.,* 1996–NMCA–018, ¶ 36, 121 N.M. 341, 911 P.2d 235 (finding clear and convincing evidence of neglect where child exhibited signs of fetal alcohol syndrome at four months of age and had bald patches from being left to lie for long periods of time). Under these circumstances, the fact that Child was exposed to drugs prenatally was not sufficient to make Child neglected.

{24} Finally, the evidence that Mother left Child in the care of nurses while she left the hospital to smoke was insufficient to establish neglect. The hospital social worker testified that during her stay in the hospital, Mother asked nurses if she could leave Child with them at the nurses' station while she left the interior of the hospital to smoke. On one occasion, Mother left Child with the nurses for more than an hour, which the hospital social worker testified was an unusually long time for a smoke break. Even if one hour is longer than what most people take for a smoke break, we do not believe that Mother's arranging to leave Child in the care of nurses constitutes neglect. *See In re Guardianship of Ashleigh R.,* 2002–NMCA–103, ¶ 20, 132 N.M. 772, 55 P.3d 984 ("Evidence that a parent left a child in the care of others is not necessarily sufficient to establish neglect, as long as the parent continues to insure that the caretaker is properly pro-

viding for the children's needs."). Here, CYFD presented no evidence that Child's needs were not provided for while Child was in the care of the nurses. In the absence of evidence of some harm to Child from the caretaker or that the parent knew that the caretaker was unsuitable, evidence that a parent left her child with a babysitter for periods of up to one hour is insufficient to establish neglect. *See In re Termination of Parental Rights of Eventyr J.*, 120 N.M. at 469, 902 P.2d at 1072 (finding the evidence sufficient to establish neglect where mother left her children in the care of her ill mother knowing that she could not properly care for the children and where the children were unattended for long periods of time).

## B. Section 32A–4–2(E)(4)

{25} The district court also adjudicated Child neglected under Section 32A–4–2(E)(4), which defines a neglected child as one "whose parent . . . is unable to discharge his responsibilities to and for the child because of incarceration, hospitalization or physical or mental disorder or incapacity." Under this section, the circumstances described in this section will constitute neglect if, and only if, such a status causes a parent to be "unable to discharge his or her parental responsibilities." *Shawna C.*, 2005–NMCA–066, ¶ 29, 137 N.M. 687, 114 P.3d 367. Under this section, an unfavorable personal status of a parent, such as incarceration, mental illness, prior convictions, or addiction, is alone insufficient to support an adjudication that a child is neglected. The Abuse and Neglect Act requires that the unfavorable status render the parent unable to provide proper parental care or discharge his or her responsibilities to the child. *Id.* ¶¶ 29, 30. The focus of the inquiry under this section is on "the acts or omissions of the parents in their caretaking function and not on apparent shortcomings of a given parent due to his or her unfavorable status." *Id.* ¶ 30. The unfavorable personal status of the parent "is . . . relevant only to the extent that it prompts either the harms defined as abuse, or the neglect." *Id.*

{26} CYFD's evidence under this section was that Mother had a long history of drug addiction and a criminal history, including several arrests and a conviction for a drug distribution offense for which she was incarcerated for a year in 2001. CYFD also presented evidence that Mother had a history of violence that included being the victim of violence and engaging in violent acts towards others.

{27} However, CYFD did not present evidence that Mother was unable to properly care for Child due to any of these circumstances. Evidence of Mother's history of violence, her former drug addiction, and her criminal history were relevant only to the extent that they rendered her unable to properly care for Child. *Shawna C.*, 2005–NMCA–066, ¶ 30, 137 N.M. 687, 114 P.3d 367; *In re Guardianship of Ashleigh R.*, 2002–NMCA–103, ¶ 21, 132 N.M. 772, 55 P.3d 984 ("Evidence of past domestic violence can be relevant in an action for neglect when the abused parent fails to recognize the harm the violence causes the children or refuses to get help in ending the situation."); *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000–NMCA–025, ¶¶ 25, 26, 128 N.M. 701, 997 P.2d 833 (showing evidence of the mother's ongoing domestic violence, ongoing substance abuse, and ongoing criminal involvement was sufficient to establish that children were neglected).

{28} We find it significant that the evidence concerning Mother's actual interactions with Child demonstrated that Mother provided appropriate parental care to Child. Dr. Parke observed that Mother exhibited "great" parenting skills and that she was very appropriate and very loving to Child. Mother was also very bonded and very responsible to Child. The hospital social worker testified that she only observed positive interactions between Mother and Child and that Mother was very loving toward Child.

{29} CYFD's evidence at best established a risk of future neglect. This same is true of the evidence of Mother's angry interactions with hospital staff, her insistence on a caesarean delivery for Child despite doctors' assurances, her willingness to disregard medical advice, and her potential housing instability. While supporting the view that Mother behaved in an irrational and unrea-

sonable manner, the evidence at best raised only tenuous inferences that Child might be neglected in the future. Without a showing that any of these factors actually rendered Mother unable to properly care for Child, the evidence amounted to inferences of future harm, which are not sufficient to establish neglect. *See Shawna C.,* 2005–NMCA–066, ¶ 22, 137 N.M. 687, 114 P.3d 367 (showing evidence that the father was angry, that he lacked empathy with the child, that he had personality traits broadly corresponding with violence, and that he had a "somewhat aged" criminal history supported only a vague inference of future harm and was not sufficient to establish neglect).

## III. CONCLUSION

{30} Even when the evidence is viewed in the light most favorable to CYFD, it is not sufficient to establish by clear and convincing evidence that Child was neglected under Sections 32A–4–2(E)(2) and (4). CYFD's evidence consisted of (1) inconclusive toxicology reports; (2) the psychologist's opinion that Mother might have difficulty developing empathy for Child based on her general psychological health; (3) inferences of future harm based on Mother's criminal history, former drug addiction, and history of violence; (4) and speculation that Mother's volatility towards hospital staff and willingness to disregard medical advice for herself might indicate future neglect of Child.

{31} CYFD did not establish that Child was without proper parental care under Section 32A–4–2(E)(2), or that Mother was unable to care for Child due to mental illness or other status under Section 32A–4–2(E)(4). We therefore reverse the adjudication of neglect. Because we reverse on this basis, we do not reach Respondent's remaining arguments on appeal.

{32} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and IRA ROBINSON, Judges.