This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-40976

**STATE OF NEW MEXICO ex rel. CHILDREN, YOUTH & FAMILIES DEPARTMENT**

      Petitioner-Appellee,

v.

**FRANKIE W.,**

      Respondent-Appellant,

**IN THE MATTER OF FAITH M.,**

      Child.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Allen Smith, District Court Judge**

Children, Youth & Families Department
Mary McQueeney, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Susan C. Baker
El Prado, NM

for Appellant

Law Office of Shasta N. Inman, LLC
Shasta N. Inman
Albuquerque, NM

Guardian Ad Litem

**DECISION**

**DUFFY, Judge.**

**{1}**     Respondent Frankie W. (Mother) appeals the district court's adjudicatory judgment and dispositional order finding that, as to Mother, Child was neglected as defined in the Children's Code, NMSA 1978, § 32A-4-2(G)(2) (2023). We affirm.

**BACKGROUND**

**{2}**     The Children, Youth and Families Department (CYFD) took Child into custody and filed an abuse/neglect petition in June 2021. During the adjudicatory hearing on the petition, the district court heard from a polygraph examiner, Child's grandfather, Child, two CYFD investigators who handled the matter, Mother, Child's maternal aunt, an officer with the New Mexico State Police, a supervisor with the Victim Advocacy Unit for the New Mexico State Police, and a senior permanency planning worker with the CYFD office in Valencia County, where Mother and Child resided at the time of the events described in the petition.

**{3}**     Mother testified that she learned in January 2020 that Child had allegedly sexually abused her younger siblings. When she spoke with Child about the allegations, Child admitted that there had been one incident of sexual abuse of her younger siblings. Child also revealed that she had been a victim of sexual abuse by an uncle. The abuse and neglect proceedings centered on Mother's response to these disclosures during the ensuing year and a half before Child was brought into CYFD custody.

**{4}**     Mother initially separated Child from her siblings, and Child was given her own room. Child testified that six months later, in June 2020, the family moved and she began sharing a room with her younger siblings again. The record contains no evidence that Child abused her siblings after the initial disclosure to Mother in January 2020 and Child testified it was a one-time incident.

**{5}**     In response to Child's allegation that she had been abused, Mother testified that she contacted her own mother (Child's maternal grandmother), who was a social worker and who encouraged Mother to file a police report. Mother contacted the sheriff's department asking for an investigation, and forensic interviews were conducted in April 2020. Mother also testified that she placed Child on a waiting list to receive therapy and other assistance, but stated that the family "just lived our life" because "[t]here wasn't anything [they] could do."

**{6}**     A little over a year later, a series of events unfolded that brought Child into CYFD custody. In May 2021, Child skipped school and ran away to spend the night at a boy's house. Mother called the police, who located Child at the boy's house the next day. Later that day, Mother placed Child at Amistad Youth Center, where she stayed for

about a week until Amistad called Mother to pick Child up. Amistad claimed that Child had attempted to sneak a boy into her room and may have had sex with him. Mother then placed Child with Child's maternal aunt.

**{7}** On June 1, 2021, Mother took Child for a polygraph examination. Mother stated that the purpose of the polygraph examination was for Mother to confirm the truth of what transpired between Child and her younger siblings, and between Child and uncle. During the polygraph examination, Child wrote on her hand that she did not feel safe and asked the technician to call someone. The polygraph company contacted the state police.

**{8}** The same day, Mother filed a report with the state police regarding criminal sexual contact between Child and Child's younger siblings. The investigating officer told Mother that Child was not permitted to be around other children until the investigation was completed.

**{9}** According to CYFD, Mother stated that Child could not return to Mother's house. Child was placed with her paternal grandfather for forty-eight hours from June first to June third, until CYFD could facilitate a family centered meeting. At the family centered meeting, a safety plan was implemented that required Child not to have contact with other children. Following the meeting, Child was placed with her maternal aunt until a permanent placement could be found. CYFD, Mother, and the state police began looking for a permanent placement but were unsuccessful. Mother testified that she contacted four treatment centers but was unable to find a placement.

**{10}** On June 20, 2021, Mother brought Child's siblings to maternal aunt's house where Child was staying. Child testified that Child's siblings ran throughout the house, requiring Child to stay in her room throughout the duration of their visit. Witnesses presented conflicting testimony as to whether the siblings were permitted to use their aunt's pool while Child remained alone in her room. Child left her aunt's house that day, but wrote a note stating that she was leaving, that she would be back later that night, and that she would tell the police if they were called that Mother had brought Child's siblings into contact with her. After discovering that Child had left later that evening, Mother called the police.

**{11}** Child arrived back early the next morning. Later that day, another family centered meeting was held. There, it was determined that the safety plan could not be extended and Child would remain in CYFD's custody since Mother did not want Child back in the family home. On June 22, 2021, CYFD filed an abuse/neglect petition.

**{12}** During the adjudicatory proceedings, CYFD's theory of neglect was that Mother had failed to take adequate steps to ensure Child's well-being. At the conclusion of the adjudicatory hearing, the district court found that Child was neglected pursuant to Section 32A-4-2(G)(2) because Mother failed to ensure Child "received the proper treatment, medical care, and emotional support necessary for [Child's] wellbeing after learning that [Child] was a victim of abuse," and that Mother "failed or refused to provide

the necessary care and control" to address Child's needs. In its oral ruling, the district court found neglectful Mother's decision to put Child in a situation where she was sharing a room with her younger siblings when Mother knew that the siblings were at risk from being around Child. The court found troubling that Mother felt the remedy was to push Child away and find some other place to house her, because that remedy did not address Child's needs. The court concluded that these facts demonstrate clear and convincing evidence of Mother's failure or refusal to provide the care and control that Child required.

**DISCUSSION**

**{13}**     On appeal, Mother contends that given Child's condition and Mother's attempts to assist her, the evidence was insufficient to adjudicate Child neglected. The term "neglected child" is defined in Section 32A-4-2(G)(2) as a child "who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent . . . or the failure or refusal of the parent . . . when able to do so, to provide them." "To meet the standard of proof in an abuse or neglect proceeding, the fact finder must be presented with clear and convincing evidence that the child was . . . neglected." *State ex rel. Child., Youth & Fams. Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 7, 137 N.M. 687, 114 P.3d 367. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Child., Youth & Fams. Dep't v. Amanda H.*, 2007-NMCA-029, ¶ 19, 141 N.M. 299, 154 P.3d 674 (internal quotation marks and citation omitted). "We employ a narrow standard of review and do not re-weigh the evidence." *Id.* "Rather, we review to determine whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing evidence standard was met." *Id.*

**{14}**     Mother argues that she provided proper parental care to Child under the circumstances, and she did everything she could to address Child's sexualized behaviors. In particular, Mother contends that she took appropriate steps to protect Child and her siblings by discussing Child's behavior with Child, separating Child from her siblings, and placing Child outside the home with relatives. Mother also notes that she tried to get Child into a treatment facility but could not find a placement.

**{15}**     The evidence presented at the adjudicatory hearing, and the reasonable inferences therefrom, contradict Mother's account in some respects. For example, although Mother maintains that she responded to the allegations that Child had abused her siblings by separating the children and never leaving them home alone, Child testified that she was separated from her siblings only for about six months and began sharing a room with her younger siblings again when the family moved to a different home. Regarding Mother's decision to move Child out of the family home, Mother testified that she began to look for placements outside of the home in late May or early June 2001, after Child spent the night with a boy. Given the timing, a fact-finder could

reasonably infer from Mother's actions and testimony that she started to look for placements outside the home because Child's behavior was spiraling out of control and not because placement outside the home would meet Child's needs, address the trauma Child had suffered, or even because it was necessary to protect Child's younger siblings.

**{16}** Mother also asserts that she made efforts to get Child treatment. Mother testified that she placed Child on a waiting list to receive resources, but stated that the pandemic presented a barrier to accessing services. Mother also asserts that she tried to get Child into residential treatment but could not find a provider. In rebuttal, CYFD presented testimony from a senior permanency planning worker regarding the services available in the area, noting that therapy and other mental health services were offered through telehealth and video visits throughout the pandemic, and that Child would have been given priority in receipt of services because of the serious trauma she had suffered. CYFD notes that Mother made little if any effort to obtain treatment for Child until CYFD became involved, more than a year and a half after Child reported the abuse. The record indicates that even then, Mother's concern was framed in terms of addressing Child's abuse of her siblings and her sexualized behaviors by getting Child out of the house and isolating her. There is no evidence that Mother recognized and addressed Child's own trauma as a victim of sexual abuse sometime in the past.

**{17}** Child testified at the adjudicatory hearing that Mother minimized Child's concerns, telling her she was being too sensitive, blamed Child for all the family's problems, and was not there for Child when Child needed her. Child told the court that she did not wish to return to Mother's home.

**{18}** In light of the evidence presented at the adjudicatory hearing, a reasonable fact-finder could find by clear and convincing evidence that Mother failed to ensure that Child received proper treatment, medical care, and emotional support necessary for her well-being after learning that Child was a victim of sexual abuse. Viewing the evidence in the light most favorable to CYFD, as we must, we conclude that substantial evidence of a clear and convincing nature supports the district court's finding that Mother neglected Child. *See State ex rel. Child., Youth & Fams. Dep't v. Michelle B.*, 2001-NMCA-071, ¶ 12, 130 N.M. 781, 32 P.3d 790 (stating that this Court is required to draw all reasonable inferences from the evidence in favor of the district court's decision, and disregard all inferences to the contrary).

**CONCLUSION**

**{19}** For the reasons stated above, we affirm.

**{20}   IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**SHAMMARA H. HENDERSON, Judge**

**JANE B. YOHALEM, Judge**