IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2025-NMCA-015

Filing Date: March 31, 2025

No. A-1-CA-42076

STATE OF NEW MEXICO, ex rel.
CHILDREN YOUTH AND FAMILIES
DEPARTMENT,

      Petitioner-Appellee,

v.

ANTHONY D.,

      Respondent-Appellant,

and

JADA M.,

      Respondent,

IN THE MATTER OF ISAAC D., a Child.

APPEAL FROM THE DISTRICT COURT OF LEA COUNTY
Lee A. Kirksey, District Court Judge

Children, Youth & Families Department
Amanda M. Romero, Chief Children's Court Attorney
Santa Fe, NM
K. Brandon Cline, Children's Court Attorney
Albuquerque, NM

for Appellee

Susan C. Baker
El Prado, NM

for Appellant

Laura K. Castillo
Hobbs, NM

Guardian Ad Litem

**OPINION**

**YOHALEM, Judge.**

**{1}**     Respondent Anthony D. (Father)[1] appeals the district court's determination that his infant son (Child) is a "neglected child," pursuant to NMSA 1978, Section 32A-4-2(G)(2) (2023) of the Abuse and Neglect Act, a part of the Children's Code. *See id.* (describing a "neglected child" as a child without proper parental care and control because of the faults of a parent, or the neglect or refusal of the parent, when able to do so, to provide proper care and control). Father argues that the New Mexico Children, Youth and Families Department (CYFD) failed to establish, by clear and convincing evidence, that (1) a serious risk of harm to Child required his removal into the custody of CYFD; or that (2) Father's failure to remedy the cockroach infestation in his home, which was the basis of CYFD's claim that Father had neglected Child, was attributable to "the faults or habits of [Father]" or to Father's "failure or refusal" to provide a safe home for Child, "when able to do so." *Id.* Following careful review of the record, we agree with Father that the district court's adjudication of Child as neglected, pursuant to Section 32A-4-2(G)(2), is not supported by substantial evidence of a clear and convincing nature. We, therefore, reverse the district court's adjudication of neglect, and remand for further proceedings consistent with this opinion.

**BACKGROUND**

**The Evidence at the Adjudicatory Hearing**

**{2}**     The adjudicatory hearing in the district court was held on May 16, 2024. The following evidence was introduced into the record by CYFD through the testimony of CYFD investigator Christina Jones.[2]

**{3}**     Child was born on December 31, 2023. CYFD initiated an investigation, which led to the filing of a petition for neglect and abuse against Parents, based on a report from the hospital that Mother had tested positive for drug use. Ms. Jones met with Parents at the hospital in Lubbock, Texas on January 2, 2024. Father expressed concern about the readiness of their home for Child, telling Ms. Jones that the bathroom plumbing was not working. Mother told Ms. Jones that she had not left the hospital because Parents did not have a car seat for Child or transportation from the hospital in Texas, where she had been transferred for Child's birth, to their home in New Mexico.

---

[1]Child's mother, Jada M. (Mother), was also found to have neglected Child. Briefing has not yet been completed on her appeal, No. A-1-CA-42079.

[2]The only witness other than Ms. Jones at the adjudicatory hearing testified about the results of the drug tests administered to Mother and Father (collectively, Parents) in the hospital following Child's birth. Because the district court found this testimony to be irrelevant to the adjudication of neglect, we do not review it here.

**{4}**     CYFD, with Parents' participation and agreement, developed a safety plan. Child would stay with Parents in their home and Father's great-aunt would live with them as a safety monitor to ensure Child's care was adequate. There would be no drugs in the home. Ms. Jones would visit the home once a week to check on Child's care. At the end of twenty-one days, CYFD would conduct a family-centered meeting (FCM) with Parents and other family members to decide on next steps.

**{5}**     The completed safety plan was presented to Parents and was signed by them on January 8, 2024. Ms. Jones described the physical condition of the home at that time as "clean and clear." She testified that she did not "see any cockroaches running around," and she was not concerned about the condition of the home. The bathroom plumbing, however, was not working (as Father had reported to her at the hospital), and Parents were using a bathroom at a convenience store down the street, and a truck stop facility for showers. Ms. Jones did not testify as to whether Parents were required to fix the plumbing as part of the first safety plan.

**{6}**     The FCM was originally scheduled for January 17, 2024. Both Parents missed the meeting. After speaking to Parents by phone, Ms. Jones rescheduled the FCM for January 24, 2024. Ms. Jones visited the home on January 22 in advance of the rescheduled FCM. Ms. Jones described seeing cockroaches on the floor, the walls, the cabinets, the bed, the legs of Child's changing table, and on the table where Child's bottles and formula were kept. There were even cockroaches on the great-aunt's body and on the clothes that she was wearing. Ms. Jones emphasized that she had not seen any cockroaches at her prior visits.

**{7}**     Ms. Jones described seeing some plugged in electrical wires around the baseboards of the kitchen and living room and a broken window covered with paper and plastic. Additionally, the kitchen cabinets were broken and there was an empty space in the kitchen where a washing machine was likely intended to be placed. Instead, there was a bucket.

**{8}**     On January 24, 2024, the day of the FCM, CYFD presented a second safety plan, requiring Parents to address the cockroach infestation, the plumbing issue, and generally clean up the home within five days in order for Child to return home. There is no evidence in the record showing any offer of help from CYFD to address the condition of the home. Parents voluntarily placed Child with Father's niece (Niece), who lived nearby, and Parents visited Child at her home under Niece's supervision. Like the earlier safety plan, this plan was entirely voluntary. No court order required it.

**{9}**     At the end of the five days, on January 29, Ms. Jones visited the home to check on Parents' progress. Child was at Niece's home, was not present in Parents' home at the time of this visit, and had not been present in Parents' home during the five days preceding the visit. Ms. Jones testified that she saw an open ditch with plumbing not yet buried outside the home, and noted that the bathroom plumbing inside was now working. She testified, however, that the cockroaches were worse. According to Ms. Jones's testimony, the cockroaches "just started swimming out" of the ceiling. Father

was attempting to kill them with roach spray. The fumes from the roach spray made it difficult to breathe and drove her out of the house. Ms. Jones reported that the cardboard box bed that the Texas hospital had given Parents was now gone and replaced with a broken playpen, which, when picked up, "roaches would come flying out." On this visit, Ms. Jones took photographs[3] showing the cockroaches, trash, and dirt she described.

{10}   As already noted, Child remained safely at Niece's house throughout this period, was not in Parents' home at the time of the inspection, and was not exposed to the roach spray. Ms. Jones reported that she had no concerns about the quality of care that Child was receiving in Niece's home or about Child's safety. She testified that she evaluated Niece's home and found it appropriate for Child, and believed that Niece could be trusted to not allow Child back in Parents' home without permission from CYFD. Niece informed Parents and CYFD that she was willing to continue to care for Child indefinitely. Ms. Jones testified that she was convinced Child was safe and well cared for with Niece. When pressed on her reasons for taking Child into custody, Ms. Jones stated that Father had not formalized Child's placement with Niece during the five days the second safety plan was in place. There was no testimony that CYFD had asked Father to do this or that Father failed or refused to sign such documents.

{11}   Nonetheless, however, Ms. Jones called law enforcement to take Child into CYFD custody, claiming that she had no choice under CYFD policy. Child was placed in nonrelative foster care on January 29, 2024, until a custody hearing could be held. CYFD filed a petition for abuse and neglect and for an ex parte custody order on February 1, 2024. An ex parte custody order was entered on February 1, 2024. The district court found probable cause that Child was neglected by Parents on February 9 (Father stipulated to probable cause). The adjudicatory hearing, which is the focus of this appeal, was held on May 16, 2024.[4]

**The District Court's Findings and Conclusions**

{12}   Relying on Ms. Jones's testimony, the district court found clear and convincing evidence of neglect under Section 32A-4-2(G)(2). The district court found that that the condition of Parents' home left Child without proper parental care and control, and posed a serious risk of harm to Child; that Father's failure to put in place a power of attorney or guardianship with Niece during the second five-day safety plan left Child at serious risk of harm; and that Father was at fault because the actions he took to remedy the condition of the home and his failure to put a guardianship in place showed an intentional or negligent disregard of Child's well-being. Father appealed.

---

3The photographs that Ms. Jones describes in her testimony, although admitted into evidence, were not part of the record provided to us. We, therefore, rely solely on her testimony for the state of the home.
4In his brief, Father discusses the evidence at the custody hearing, claiming it was insufficient to establish probable cause to retain Child in State custody. Father however, elects to proceed solely with his appeal of the adjudicatory judgment. Therefore, we consider only Father's contention that CYFD did not present sufficient evidence at the adjudicatory hearing to establish that Child was neglected.

## DISCUSSION

**I.     New Mexico's Legal Standard for Neglect Under Section 32A-4-2(G)(2)**

**{13}**     Section 32A-4-2(G)(2) defines a "neglected child" as a child

> who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them.

**{14}**     Our Supreme Court has recently construed Section 32A-4-2(G)(2) to require "that two conditions be satisfied before a child meets the definition of a neglected child." *State ex rel. Child., Youth & Fams. Dep't v. Heather S.*, 2025-NMSC-002, ¶ 29, 563 P.3d 821. "The first [condition] addresses the circumstances and condition of the child, mandating that the child must be 'without proper parental care and control necessary for the child's well-being.'" *Id.* (quoting § 32A-4-2(G)(2) (omission omitted)). "The second [condition] addresses the culpability of the parent, requiring that the child's lack of proper parental care and control must be '*because of* the faults or habits' of child's parent or the 'failure or refusal' of child's parent to provide the necessary 'care or control.'" *Id.* (quoting § 32A-4-2(G)(2)). Absent sufficient proof by clear and convincing evidence of both of these elements, a child is not neglected. *Id.*

**{15}**     In determining legislative intent as to the meaning of the phrase "necessary for the child's well-being," § 32A-4-2(G)(2), our Supreme Court in *Heather S.* relied in part on the Legislature's statement of policies and purposes it sought to achieve in the Children's Code. Section 32A-1-3(A) explains that, under the provisions of the Children's Code, "[a] child's health and safety shall be the paramount concern," along with the preservation of the family whenever possible. Further, Section 32A-1-3(A) notes that "[p]ermanent separation of a child from [that] child's family" could be justified "when the child . . . has suffered permanent or severe injury or repeated abuse."

**{16}**     Based in part on these statements of legislative purpose, our Supreme Court concluded that "the Legislature intended that to find a child to be without proper parental care and control necessary for the child's well-being such that the child must be removed from the family, the child must be subjected to circumstances that create a serious risk to the child's mental or physical health and safety." *Heather S.*, 2025-NMSC-002, ¶ 35. "A serious risk is one that is likely to result in important or dangerous consequences for the child." *Id.*

**{17}**     We are reminded by *Heather S.* that, under these standards, courts must be "cautious to avoid finding neglect in every lapse in parental care or control and must focus on those instances or circumstances likely to have a serious or significant impact on a child's health and safety." *Id.* Moreover, "[a]bsent clear and convincing evidence of

a serious risk to [the c]hild, . . . removal and foster care should not be CYFD's first course of action and [the c]hild cannot be adjudicated neglected." *Id.* ¶ 68

**{18}** If the district court determines that a child is "without proper parental care and control . . . necessary for the child's well-being," the next determination the district court must make is whether the lack of proper parental care and control is "*because* of the faults or habits of the child's parent . . . or the failure or refusal of the parent . . . , *when able to do so*, to provide them." Section 32A-4-2(G)(2) (emphasis added); *see Heather S.*, 2025-NMSC-002, ¶ 29 (describing the second condition the courts must consider). In this provision, the Legislature "take[s] into account differing abilities of parents to provide resources necessary for the well-being of their children." *Heather S.*, 2025-NMSC-002, ¶ 37. In determining neglect under Section 32A-4-2(G)(2), the focus "should be on the acts or omissions of the parents in their caretaking function and not on apparent shortcomings of a given parent due to any unfavorable status, poverty being the most common." *Heather S.*, 2025-NMSC-002, ¶ 37 (text only) (citation omitted). We consider "whether it is the parent's acts or omissions, rather than poverty, or some other unfavorable status that are the cause of the parent's shortcomings." *Id.* ¶ 38. As this Court has held, to make a finding of neglect under Section 32A-4-2(G)(2), "[t]he district court must have been presented with clear and convincing evidence of [a parent's] culpability through intentional or negligent disregard of [a c]hild's well-being and proper needs." *State ex rel. Child., Youth & Fams. Dep't v. Amanda H.*, 2007-NMCA-029, ¶ 21, 141 N.M. 299, 154 P.3d 674.

**{19}** With these principles in mind, we look to whether substantial evidence supports a finding of neglect in this case.

## II. The District Court's Adjudication of Neglect Is Not Supported by Substantial Evidence of a Clear and Convincing Nature

**{20}** Father challenges both the district court's finding (1) that the condition of Parents' home left Child without proper parental care and control, and (2) that Father was at fault because the actions he took to remedy the condition of the home showed an intentional or negligent disregard of Child's well-being and needs. Specifically, Father argues that Parents' voluntary placement of Child in the home of a relative—Niece—who agreed to provide care to Child in a safe and healthy setting, was a proper exercise of parental care and control, protecting Child from any serious risk of harm while Father addressed the cockroach infestation so Child could return home.

**{21}** Father argues as well that undisputed circumstantial evidence in the record establishes Father's poverty, and that CYFD failed to provide clear and convincing evidence that Father's failure to remedy the cockroach infestation during the five days he was given by CYFD was attributable to Father's intentional or negligent acts or omissions, rather than to poverty. After a careful review of the evidence, we agree with Father that CYFD failed to establish by the required substantial clear and convincing evidence either of the two elements necessary to support an adjudication of neglect under Section 32A-4-2(G)(2).

**{22}** "We employ a narrow standard of review and do not re[]weigh the evidence." *Amanda H.*, 2007-NMCA-029, ¶ 19. "Rather, we review to determine whether, viewing the evidence in the light most favorable to the prevailing party, the fact[-]finder could properly determine that the clear and convincing evidence standard was met." *Id.* "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted).

## A.    The District Court's Finding That Father Left Child Without Proper Parental Care and Control Necessary for Child's Well-Being is Not Supported by Substantial Evidence

**{23}** In concluding that Child was neglected as defined by Section 32A-4-2(G)(2), the district court made the following findings of fact:

> Mother told CYFD that she and Father did not have a car seat for [Child]. When CYFD visited the home Mother, Father, and [Child] were living in, the home was extremely dirty and roaches were everywhere including in the broken play[]pen the parents had for [Child] to sleep in, on the changing table while [Child] was being changed, and near the formula for [Child] to eat. CYFD worker described swarms of roaches and Father spraying roach spray in the air so much that they had to step outside [of] the home. During the two safety plans that were attempted, Mother and Father did not take steps such as [p]ower of [a]ttorney or guardianship to formalize [Child]'s placement with relatives. CYFD could not simply walk away from [Child] when there were no formal arrangements in place for his immediate or long[-]term future and safety.

**{24}** We note at the outset that some of the district court's findings confuse the events and condition of the home at the time of each visit from Ms. Jones. The district court conflated the visit when Child was residing in the home with the visit when Child was not residing there. Contrary to the district court's findings, the evidence establishes that Child was not present in the home when Father sprayed roach spray in the air "so much that they had to step outside [of] the home." The evidence established that the incident where roach spray was used occurred when Child was safely at Niece's house and not in the home. Similarly, there is no evidence that Child ever slept in the playpen that the district court described as broken and infested with cockroaches. The record showed that during the five days Child was living in Niece's house, Parents replaced a cardboard bed brought home from the hospital with the playpen.

**{25}** Importantly, Father's argument is not that the home was a safe and healthy place for Child during the cockroach infestation. Father claims instead that the undisputed evidence shows that he exercised proper parental care and control to keep Child safe by placing Child with Niece. First, the evidence shows that the cockroach infestation occurred suddenly, shortly before Ms. Jones's January 22 visit; Ms. Jones testified that

she had not seen any cockroaches on her prior visits. Ms. Jones testified that the home was clean and clear of cockroaches, and that she had no concerns about Child's safety on January 8 when she visited to have Parents sign the first safety plan. She also reported that she was conducting weekly check-ins with Parents between January 8 and the FCM, apparently without identifying any health or safety concerns in the home. But when Ms. Jones visited on January 22, before the rescheduled January 24 FCM, she reported that the home was severely infested with cockroaches. Although this infestation could have an adverse impact on an infant, CYFD presented no evidence about either the cause of the sudden overwhelming cockroach infestation Ms. Jones described, or whether Parents had taken any actions to address the infestation before Ms. Jones visited on January 22.

{26} Critically, after the January 22 visit, Parents agreed to the second safety plan, placing Child with Niece while they attempted to remediate the cockroach infestation and to fix the plumbing in the bathroom. Ms. Jones testified that the placement of Child with Niece by Parents was voluntary; no court order was in place at that time.

{27} At the end of five days, Ms. Jones returned to the home on January 29 to find the plumbing fixed, and the common areas of the home straightened up and cleaned. Other private bedroom areas, however, remained cluttered and dirty, according to Ms. Jones, and, most important to the district court's finding of neglect, the cockroach infestation, if anything, was worse. As clarified above, it was during this visit on January 29 that Father sprayed roach spray in an attempt to kill some of the cockroaches. There was no evidence that CYFD offered Parents any help in addressing the severe cockroach infestation Ms. Jones described to the district court.

{28} Ms. Jones testified that she had no concerns about Child's safety at Niece's home, and that Niece was doing everything necessary to care for Child. Further, Niece was willing to continue caring for Child "indefinitely" while Father fixed the home for Child's return.

{29} As previously noted, Father does not challenge the sufficiency of the evidence to support the district court's finding that the condition of the home was not safe for Child. Father instead argues that his placement of Child with Niece, an appropriate relative, who CYFD admits was providing a safe living space and adequate parental care for Child, demonstrated proper parental care and control, and removed any serious risk of harm to Child from the condition of Parents' home.

{30} Specifically, Father disputes the district court's conclusion that Parents' voluntary placement of Child with Niece was not adequate to protect Child because "[Parents] did not take steps such as [p]ower of [a]ttorney or guardianship to formalize [Child's] placement with relatives." We agree with Father that evidence that a parent left a child in the care of others without a formal guardianship or power of attorney is not alone sufficient to establish neglect.

**{31}** In *In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 20, 132 N.M. 772, 55 P.3d 984, this Court held that "as long as the parent continues to insure that the caretaker is properly providing for the children's needs," leaving a child in the care of others is not necessarily neglect. We reasoned that "[a] contrary rule would have the unfortunate effect of discouraging parents from seeking assistance when they find themselves unable to fully discharge the responsibilities of parenthood." *Id.*

**{32}** If a child is in the legal custody of CYFD by court order, formal legal requirements apply to CYFD's placement of a child in the home of a relative. But when the child is not in CYFD custody, it is not neglect for a parent to place a child temporarily in the care of a relative without establishing a formal legal relationship. The record appears to show that Parents were visiting Child in Niece's home, and thus were discharging both their responsibility to maintain their relationship with Child and to make sure that Child was adequately cared for in Niece's home. Parents were not prohibited from visiting Child or assisting with Child's care, and CYFD presented no evidence that Child was returned to the cockroach-infested family home. Finally, there is no evidence in the record that Parents were asked by CYFD to sign a power of attorney or enter into a guardianship, and that they refused to do so.

**{33}** In sum, we do not find that the district court's finding of a failure by Father to provide proper parental care and control, such that Child was put at serious risk of harm, is supported by substantial clear and convincing evidence.

**B.      CYFD Failed to Introduce Evidence Showing That Any Lack of Proper Parental Care and Control Was Because of the Faults and Habits of Father**

**{34}** As discussed previously, the second condition necessary for an adjudication of neglect under Section 32A-4-2(G)(2) is clear and convincing evidence of parental culpability. *See Heather S.*, 2025-NMSC-002, ¶ 29. "The focus of this culpability element should be on the acts or omissions of the parents in their caretaking function and not on apparent shortcomings of a given parent due to any unfavorable status." *Id.* ¶ 37 (text only) (citation omitted). "[T]he court must have been presented with clear and convincing evidence of [the parents'] culpability through intentional or negligent disregard of [the child's] well-being and proper needs." *State ex rel. Child., Youth & Fams. Dep't v. Michelle B.*, 2001-NMCA-071, ¶ 17, 130 N.M. 781, 32 P.3d 790.

**{35}** Father argues that his actions in response to the cockroach infestation were reasonable and that CYFD failed to prove that his failure to eliminate the infestation within the five days he was given by the second safety plan was not the result of his indigent status rather than any intentional or negligent conduct. CYFD argues in response that "Father provided no evidence at the adjudicatory hearing that the condition of the home was caused by poverty."

**{36}** CYFD's argument misstates the burden of proof at an adjudicatory hearing. Our Supreme Court has construed Section 32A-4-2(G)(2) to create a presumption "that it is in a child's best interest to remain with the child's parent unless the state provides clear

and convincing evidence to support each specific element of Section 32A-4-2(G)(2)." *Heather S.*, 2025-NMSC-002, ¶ 38 (internal quotation marks omitted).

**{37}** Although no explicit evidence of Father's poverty was presented at the adjudicatory hearing, poverty can be inferred from circumstantial evidence in the record. *See, e.g.*, *State v. Chavez*, 2009-NMSC-035, ¶¶ 34-35, 146 N.M. 434, 211 P.3d 891 (relying on the record to conclude conditions within the home "evidence poverty"); *Heather S.*, 2025-NMSC-002, ¶ 70 (relying on circumstantial evidence in the record to determine that the mother was impacted by poverty). The record at the adjudicatory hearing clearly shows that Parents were impacted by poverty. Father told Ms. Jones that he was concerned that the bathroom plumbing was not working when they first spoke at the hospital, and that Parents were using the bathroom facilities at a nearby convenience store and truck stop. Parents did not have a car seat for Child, or transportation to return home from the Texas hospital where Mother had been transferred for Child's birth. Ms. Jones reported that there was a place for a washing machine in the home, but the washing machine had apparently been removed and a bucket took its place. Further, only paper and plastic covered one of the broken exterior windows of the home. This is adequate circumstantial evidence of poverty. The evidence in the record, although establishing that Father was impacted by poverty, does not show that Father either acted unreasonably in trying to get rid of the cockroaches with roach spray or that he had the financial ability to take more effective action.

**{38}** We note that there is no evidence showing any effort by CYFD to assist Father in improving the condition of the home so that removal of Child into CYFD custody could be avoided, something that is required even if Father was not impoverished. *Cf. Heather S.*, 2025-NMSC-002, ¶ 64 (explaining CYFD's duty to provide in-home services regardless of the parents' income or status). The law and regulations governing CYFD require "reasonable efforts to maintain the family unit and prevent the removal of a child from their home, as long as the child's safety is assured." 8.10.3.16(A) NMAC; § 32A-4-21(B)(5). There is no evidence that CYFD offered any assistance to Father in remedying the cockroach infestation or even inquired about whether such assistance was needed.[5]

**CONCLUSION**

**{39}** For the reasons stated, we reverse the district court's adjudication of neglect as to Father and remand to the district court for further proceedings. *See, e.g.*, *State ex rel. Child., Youth & Fams. Dep't v. Benjamin O.*, 2007-NMCA-070, ¶¶ 38-39, 141 N.M. 692, 160 P.3d 601 (providing that, following a determination that the parent was wrongfully adjudicated to have neglected or abused the child, "the court and CYFD

---

[5]We note that child protection agencies outside New Mexico routinely assist struggling families with pest removal services. *See*, *e.g.*, *In re Interest of A.A.*, 2023 WL 6159438 at *4 (Pa. Super. Ct. 2023) (providing testimony that child protective services "assisted the family in paying for pest removal") (unpublished table decision); *In re Interest of S.B.*, 597 S.W.3d 571, 584 (Tex. App. 2020) ("The [Children's] Department paid for an exterminator."); *In re C.P.*, 2025 IL. App. (4th) 241207-U, ¶ 6 (order) (stating that after an inspection of the home, the department determined "an exterminator was needed to address the cockroach infestation[,]" and "obtained funding for the exterminator").

must . . . seriously consider whether reunification is possible" and that CYFD is not necessarily "foreclosed from seeking a termination of [the parents' parental rights").

{40}   IT IS SO ORDERED.

JANE B. YOHALEM, Judge

WE CONCUR:

ZACHARY A. IVES, Judge

SHAMMARA H. HENDERSON, Judge